1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT

8                    FOR THE EASTERN DISTRICT OF CALIFORNIA

9    ROBERT HAYDEN NESBITT, Jr.,

10                  Petitioner,                      No. CIV S-09-2821 GEB GGH P

11          vs.

12   FRANCISCO JACQUEZ, Warden,

13                  Respondent.                    _____ORDER

14   _____/

15   Introduction

16                  Petitioner, proceeding with appointed counsel, filed pro se a petition superseded

17   by an amended petition, pursuant to 28 U.S.C. § 2254.   After pleading no contest to ten counts

18   of robbery on October 6, 2003, petitioner was sentenced to a term of 133-years-to-life under

19   California's "three-strikes" law in Solano County Superior Court on December 9, 2005.

20   Amended Petition (AP), pp. 1[1]; Motion for Discovery (Mot.), p. 3.  The sole claim of the

21   amended petition is that the "trial court and court of appeal unreasonably applied established

22   federal constitutional law when it decided that petitioner was not entitled to a fair sentencing

23   hearing."  AP, pp. 4, 19-28.  Petitioner's counsel filed a motion for discovery on June 28, 2010,

24   to which respondent filed an opposition on July 15, 2010, after which petitioner filed a reply on

25   _____

26          [1] The court's electronic pagination is referenced.

1

1    July 20, 2010.

2    <u>Motion for Discovery</u>

3          On July 29, 2010, petitioner's motion for discovery came on for hearing.

4 Petitioner was represented by Stephanie Adratkas; Joan Killeen appeared for respondent.

5 Petitioner's claim is "that the trial court violated his right to due process and a fair sentencing

6 hearing when it sua sponte reviewed a juvenile probation report[2] as evidence at the hearing on his

7 motion to strike his prior convictions in the interests of justice pursuant to <u>People v. Superior</u>

8 <u>Court (Romero),</u> 13 Cal.4th 497[, 53 Cal. Rptr. 2d ]([Cal.] 1996)." Mot., p. 3.  At the <u>Romero</u>

9 hearing, petitioner's defense counsel argued the petitioner had been "the victim of severe

10 physical and psychological abuse by his parents, and in particular his father."  Id.  Petitioner

11 contends that after the sentencing judge had read the juvenile probation report and considered

12 other evidence at the hearing, the court denied the motion, asserting that when petitioner had

13 spoken to the juvenile probation officer, he had denied being the victim of physical or of verbal

14 abuse.  Id., citing the August 30, 2005, Reporter's Transcript (RT), pp. 56-59.

15          Petitioner's counsel goes on to explain that during her investigation of petitioner's

16 claims that she has obtained a copy of a March 28, 1983, a City of Hawthorne, California Police

17 Department police report, when petitioner was approximately eight years old.  Mot., p. 3.  The

18 police report contains a report of an incident wherein police had been contacted regarding a

19 report of child abuse when petitioner's swimming instructor noticed that he had "'several very

20 long darkened marks extending from shoulder blade to shoulder blade.'"  Id.  Counsel for

21 petitioner states that the investigating office noted "'two of the marks were in the shape of a

22 rectangle (approx. ½" by 6.)'"  Id.  According to petitioner's counsel, when petitioner was

23 questioned, he told a police officer his mother hit him with a belt on his back side and back.  Id.

24

---

25        [2] Petitioner includes an unauthenticated copy of the report as an exhibit to his amended
petition (docket # 4-1 at pp. 120-152).  It is not an authenticated copy, but respondent does not

26 raise an objection to it or challenge its authenticity.

1    at 3-4.  When he was asked about the marks on his back, petitioner told police his mother had

2    told them that he had the marks at birth.  Id. at 4.[3]

3             Petitioner's counsel indicates that she "contacted the Los Angeles County

4    Department of Children and Family Services to obtain a copy of any material they may have

5    regarding an investigation of that incident or any other incidents of child abuse" of petitioner.

6    Mot., p. 4.  Counsel avers that she wrote a letter to that agency on May 18, 2010, requesting any

7    such records and providing them with a release from petitioner, but had not received a response.

8    Id., & Declaration of petitioner's counsel, ¶ 8.

9             Petitioner asks the court to permit petitioner to issue a subpoena duces tecum for

10    Los Angeles County Department of Children and Family Services records relating to child abuse

11    of petitioner, arguing that such records are necessary for petitioner to support his claims that his

12    attorneys were ineffective for failing to rebut the information contained in the juvenile probation

13    report and to show petitioner was prejudiced by the sentencing court's reliance on hearsay in the

14    report.  Mot., p. 4.  Petitioner maintains that the discovery is relevant to petitioner's claim

15    regarding a violation of his rights to due process and a fair sentencing hearing when hearsay

16    statements in a juvenile probation report were considered sua sponte by the court, indicating

17    petitioner had a good relationship with his parents.  Id.  This court notes that this is the only

18    claim upon which the petitioner is presently proceeding.   However, counsel for petitioner argues

19    that the records are also required to support a potential ineffective assistance of counsel claim on

20    the grounds that his trial counsel should have sought a continuance to obtain rebuttal evidence to

21    the information in the probation report which suggested petitioner had not been abused as a child

22

---

23        [3] Petitioner's counsel states that she has provided respondent with a copy of the police
24    report and in her motion indicates she will provide a copy of the record for the court's review at
     the hearing.  At the present time, the undersigned does not have any such copy and the recorded
     argument of the hearing does not indicate one was presented.  However, a copy of the police
25    report record is not necessary for this court to rule on the pending motion.  There does not appear
     to be any dispute as to its content and the court accepts petitioner's counsel's representation of its
26    contents for purposes of ruling on this motion.

1    by his parents.  Id.  Petitioner maintains there is good cause for the discovery which is sought

2    pursuant to Rule 6 of the Rules Governing § 2254 Cases and Fed. R. Civ. P. 45 because the

3    aforementioned police report establishes notification of the police of evidence of petitioner's

4    child abuse and because he identified his mother as having hit him with a belt.  Id., at 4-5.

5            In opposition, respondent emphasizes that the only claim upon which petitioner is

6    proceeding is the claim that has been exhausted, that "the trial court erred in taking judicial

7    notice of a 1991 juvenile probation report that contradicted his claim of childhood physical and

8    psychological abuse."  Opposition (Opp.), p. 2 & Ex. A (docket # 28-1), copy of unpublished

9    California First District Court of Appeal opinion, p. 2.  Petitioner, respondent notes, pleaded no

10   contest to 10 counts of second degree robbery, being a felon in possession of a firearm and

11   conspiracy to commit robbery, as well as admitting that he personally used a firearm, that he had

12   a prior serious felony conviction and that he had six prior strike convictions, all for robbery.  Id.,

13   p. & Ex. A, pp. 2-3.

14           In the reply, petitioner adds to the description of abuse petitioner gave officers

15   when he was eight including not only his mother beating with a belt, but his father hitting him

16   "'on the backside with his hands.'"  Reply, p. 1.  As to the marks on his back which he said his

17   mother had told him he was born with, apparently, according to the report petitioner's mother

18   admitted hitting petitioner with a belt, but denied hitting on the back.  Id.

19   <u>Discussion</u>

20           As respondent contends, habeas petitioners, unlike other civil litigants, are not

21   entitled to discovery as a matter of course.  Opp., pp. 1-2.  "Parties in habeas cases, unlike those

22   in ordinary civil cases, have no right to discovery."  <u>Bittaker v. Woodford</u>, 331 F.3d 715, 728

23   (9th Cir. 2003), citing <u>Campbell v. Blodgett</u>, 982 F.2d 1356, 1358 (9th Cir.1993) ("there simply

24   is no federal right, constitutional or otherwise, to discovery in habeas proceedings as a general

25   matter" (in turn, citing <u>Harris v. Nelson</u>, 394 U.S. 286, 296, 89 S.Ct. 1082, 22 L.Ed.2d 281

26   (1969))); <u>see also</u>, <u>Rich v. Calderon</u>, 187 F.3d 1064, 1068 (9th Cir. 1999)("A habeas petitioner

4

1  does not enjoy the presumptive entitlement to discovery of a traditional civil litigant.  <u>Bracy v.</u>

2  <u>Gramley</u>, 520 U.S. 899, 903-05, 117 S.Ct. 1793, 1796-97, 138 L.Ed.2d 97 (1997).”).

3         Discovery under the Federal Rules of Civil Procedure in a habeas case is only

4  available:

5         “if, and to the extent that, the judge in the exercise of his discretion
          and for good cause shown grants leave to do so, but not otherwise.”
6         Rules Governing Section 2254 Cases in the United States District
          Courts [hereinafter Habeas Rules], Rule 6(a); <u>see</u> <u>Bracy v.</u>
7         <u>Gramley</u>, 520 U.S. 899, 904, 117 S.Ct. 1793, 138 L.Ed.2d 97
          (1997).

8  <u>Bittaker</u>, <u>supra</u>, 331 F.3d at 728.

9

10        The Supreme Court has stated that Rule 6(a) “is meant to be
          ‘consistent’ ” with its holding in <u>Harris v. Nelson</u>, 394 U.S. 286,
11        89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), in which the Court held that
          “where specific allegations before the court show reason to believe
12        that the petitioner may, if the facts are fully developed, be able to
          demonstrate that he is ... entitled to relief, it is the duty of the court
13        to provide the necessary facilities and procedures for an adequate
          inquiry.” <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-09, 117 S.Ct. 1793,
14        138 L.Ed.2d 97 (1997) (quoting <u>Harris</u>, 394 U.S. at 300, 89 S.Ct.
          1082) (alteration in original). Likewise, we have held that a district
15        court abused its discretion in not ordering Rule 6(a) discovery
          when discovery was “essential” for the habeas petitioner to
16        “develop fully” his underlying claim.  <u>Jones</u>, 114 F.3d at 1009.

17  <u>Pham v. Terhune</u>, 400 F.3d 740, 743 (9th Cir. 2005).

18        Thus, the matter of discovery is very much merits oriented.  If for legal reasons

19  the claims are simply not actionable, no matter the claimed specific facts, no discovery should be

20  permitted as it will ultimately be a waste of time.  And, in taking a look at the merits to see if a

21  fully developed record will entitle the petitioner to relief, the court is very much bound to utilize

22  the AEDPA standard to assess that chance for relief.  <u>See</u> <u>Schiro v. Landrigan</u>, 550 U.S. 465,

23  474, 127 S.Ct. 1933 (2007).  In this case, petitioner has made, or would make, specific

24  allegations; however, it remains to be shown whether these allegations would afford any relief in

25  this case.

26  \\\\\

5

AEDPA applies to this petition.[4]  The applicable standard, that is, the clearly established Supreme Court authority, therefore, for petitioner to show to implicate a sentencing decision is that the sentence was "founded at least in part upon misinformation of constitutional magnitude." United States v. Tucker, 404 U.S. 443, 447, 92 S. Ct. 589, 591 (1972).  To show any entitlement to the discovery at issue, petitioner's claim must implicate the sentencing decision *as having been significantly based* on information that was materially untrue.  Tucker, supra, at 447, 92 S. Ct. at 592, quoting Townsend v. Burke, 334 U.S. 736, 741, 68 S. Ct. 1252, 1255 (1948), for the applicable standard: "'this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue.'"  Because the California Supreme Court was silent as to why petitioner's habeas petition was denied, it is permissible to "look through" its decision to the last reasoned state court decision, which was that of the Second Appellate District.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

As there has been no response to the pro se amended petition filed at this point, the underlying sentencing record has not yet formally been submitted to this court.  However, petitioner included a copy of the Reporter's Transcript of the hearing of the Romero motion in the Solano County Superior Court, dated July 29, 2005 (dkt. # 4, pp. 31-107), the RT for the August 5, 2005 proceedings (dkt. # 4, pp. 109-210), the RT for the proceedings of August 26 and

---

[4] The Anti-Terrorism and Effective Death Penalty Act (AEDPA) "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).  When assuming the legal implications of the alleged error, the findings of the state courts must be upheld unless those findings are an unreasonable (not just erroneous) application of established Supreme Court authority or was based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d); Byrd v. Lewis, 566 F.3d 855, 859 (9th Cir.2009).

1  30 of 2005 (dkt. # 4-1, pp. 2-74), the RT for the December 9, 2005 sentencing proceedings (dkt.

2  # 4-1, pp. 76-119).  Again, although not authenticated, respondent has not challenged the

3  authenticity of the RT copies.  Petitioner moves for discovery of any material the Los Angeles

4  County Department of Children and Family Services may have regarding an investigation of any

5  and all incidents of abuse of petitioner as a child to shore up a potential claim for ineffective

6  assistance of counsel and to further support the actual claim on which petitioner now proceeds,

7  that he was deprived of due process and a fair trial when the sentencing judge relied on

8  inaccurate information in a juvenile probation report (that contradicted, or at least, undermined,

9  petitioner's evidence presented at the Romero motion).  The undersigned has reviewed the entire

10  Romero motion and underlying proceedings, including the testimony, argument and sentencing,

11  as well as petitioner's copy of the 1991 juvenile probation report at issue.  The 2007 state

12  appellate court summarizes the background to the Romero motion, and the court's independent

13  review confirms its accuracy with regard to the witness testimony and other evidence presented

14  at the hearing, as well as the argument and decision on the motion:

15      After protracted pretrial proceedings, defendant pleaded no contest
to all charges and admitted the special allegations on October 6,

16  2003.  The parties agreed there were no promises regarding
sentencing and that defense counsel would be filing a Romero

17  motion.  Defendant acknowledged that he could receive a
maximum sentence of 360 years to life in prison.  Immediately

18  after filing his Romero motion, defendant moved to set aside his
plea.  At defendant's request, a second attorney was appointed to

19  review his plea agreement and Romero motion.  In February 2005,
defendant's second counsel, Robert Fracchia, advised the court that

20  defendant would not pursue his motion to withdraw his plea, but
that he wished to submit supplementary materials in support of his

21  Romero motion.  Defendant thereafter filed several supplemental
documents in support of his Romero motion, including: a

22  psychosocial history prepared by Dr. Gretchen E. White, a clinical
psychologist retained by the defense; defendant's own report as to

23  his personal development during the period of his incarceration;
and a declaration by a county official as to defendant's conduct at

24  the jail.

25      1. Defendant's Psychosocial History

26      On July 29, August 5, and August 26, 2005, the trial court heard

evidence and argument on defendant's <u>Romero</u> motion.  Dr. White testified about her written psychosocial history, which included allegations that defendant had suffered extreme physical and psychological abuse at the hands of his father.  According to the report, defendant was beaten with a belt a minimum of three times per week from a very early age.  He would be punished for making extremely minor mistakes, such as dropping food on the floor. Defendant had to have permission from his father for everything, including getting a glass of water.  He was so afraid of his father that he would sometimes drink water from the toilet rather than approach his father.  Defendant was constantly under restrictions from his parents to the point that he was unable to make friends or play team sports.  Due to the father's financial irresponsibility, defendant and his brother also had few toys and could not afford to participate in organized activities outside the home such as the Boy Scouts.  At about six years of age, defendant began running away. According to defendant's mother, defendant ran away at least twice a year until he was about 14 years old, and would stay away for one to three days, sometimes staying in parks and libraries.

Both parents were career United States Air Force personnel and military mores had a significant effect on their thinking. According to defendant's father, they tended to see things in "black and white" terms.  The family also moved frequently, increasing defendant's social isolation and resulting in dramatic changes in the socioeconomic and racial make-ups of the neighborhoods in which he lived.  According to Dr. White, the combination of factors in defendant's upbringing caused him to internalize a very punitive attitude toward himself, and to exhibit excessive anger and strong tendencies toward impulsivity as well as self-sabotage. On the latter point, she opined that when defendant was on the verge of succeeding he would assume that since his success would not affect his parents' attitude toward him he would "get back at them by messing up."

Dr. White's psychosocial history of defendant also referenced a serious automobile accident that occurred when defendant was 15 years old.  He was riding in a car with schoolmates that flipped over three times.  Defendant was thrown from the vehicle and suffered severe injuries and a period of apparent depression.  It was shortly after this accident that defendant committed the armed robbery for which he was sent to Rites of Passage.

Defendant's mother testified about the beatings to which defendant had assertedly been subjected, his pattern of running away from home, the restrictions and controls placed on him by his father, and the physical and emotional effects of the car accident that occurred when he was 15.  His father was present at the hearing but did not testify.  According to Dr. White, when she interviewed defendant's father he minimized the alleged abuse that defendant had experienced.  She never asked him about the mother's specific

8

claims of abuse, such as the regular beatings and extreme strictness over minor infractions.

2. Defendant's Transformation While in Custody

Other witnesses testified about defendant's personal growth during his incarceration in the county jail and about the positive effect he had on other inmates. FN2  Stanley Maynard met defendant through his stepson, who was defendant's cellmate.  Maynard found him to be sincere, intelligent, and very supportive of others. Former inmate Leroy Comier testified that defendant helped him grow, mature mentally, take responsibility for his criminal conduct, and better himself.  Philip Norris had known defendant for about 11 years, dating from defendant's CYA confinement.  He had seen tremendous changes in defendant, and had turned to defendant often for advice and guidance.

> FN2. Defendant was arrested in Mississippi in November 1997 and was transferred to the Solano County Jail on January 16, 1998.  As of the date his Romero hearing began in 2005, defendant had been an inmate at the county jail continuously since January 16, 1998.

Dr. Michael Castell had a Ph.D. in counseling psychology and had worked in the mental health field for 30 years.  At the time of his testimony, he had been running inmate programs for the Solano County Sheriff's Office for eight years.  He had his first counseling session with defendant at the end of 2000.  He watched defendant go from being in an isolation unit for disciplinary reasons to being a model prisoner who was constantly striving to better himself in terms of his thinking, education, and behavior.  According to Castell, defendant had read hundreds of books on serious subjects and was actively trying to grapple with issues of moral development and personal authenticity.  He had taken a leadership role in the prison's life skills program for inmates.  Castell had heard from several inmates that defendant helped them stay out of trouble.

3. Defense's Romero Argument

According to defense counsel, defendant's juvenile and adult robberies occurred in three separate time periods during which he was acting under particular pressures.  In 1991, he robbed to get money for clothes so he would fit in better with his school friends. During the strike offenses in 1993, he had recently become addicted to cocaine and was thinking only of how he could purchase more.  FN3  In 1997, he relapsed into his old pattern due to the use of narcotics, setbacks in his personal life, and his wounded sense of self.  Although the robberies were serious, defendant never used violence and, with the exception of the

9

Round Table Pizza robbery, did not use real guns.  Although defendant did have a loaded weapon with him during the Round Table robbery, he only produced it after an employee tried to tackle and subdue him.

> FN3. In connection with the 1993 offenses, defendant had told a psychologist who interviewed him, Dr. Carlton Purviance, that he had developed a strong addiction to rock cocaine in late 1992, and carried out the January and February 1993 robberies to obtain cash to purchase more cocaine. He also told Purviance that no "significant family conflicts were relevant to the picture."

Regarding defendant's childhood and his future potential, defense counsel summed up his argument as follows: "And we are not saying that all of these experiences are an excuse for [defendant's] behavior.  What we are saying is that his experiences as a child and what he went through explains who he is and ... why he developed the attitude he did, explains the willingness at a young age to throw away a promising future.... And the comments to the probation officer I think support fully the notion that he has accepted who he is.  And that is why he has demonstrated the tremendous growth and change and potential that has been repeatedly referred to by the number of witnesses who came to the court for his application to strike these prior convictions."

After hearing argument on August 26, 2005, the trial court took the matter under submission, and advised counsel that it would announce its ruling at a hearing, which was set for August 30.

4. Judicial Notice of 1991 Juvenile Court Documents

On the afternoon of August 29, 2005, the trial court advised all counsel by facsimile message that it had decided on its own initiative to take judicial notice of certain documents from defendant's 1991 juvenile court file.  Copies of the documents were attached to the message.

Most significantly, the documents recounted statements made to the probation officer by defendant and his parents in 1991 that appeared to undercut his claim that he suffered severe mental and physical abuse at the hands of his father.  At that time, defendant denied any history of verbal or physical abuse in the family, reported that he had a "great" relationship and "great" communication with his father, and stated that when he did occasionally receive corporal punishment it was his mother who would impose it.  He reported that his father was more willing to give him a break than his mother.  He told the probation officer that he had run away approximately seven times, and that he ran for " 'dumb' " reasons such as a bad report card.  The report stated:

"The minor reports that the biggest problem with his parents is him not keeping his grades up." According to the report, both of defendant's parents also reported that defendant had a good relationship with his father.

The report also contradicted Dr. White's psychosocial history in other respects. Defendant reported that he had lots of friends and activities, although his parents often restricted him to his room and took away his privileges because he was always in trouble. When caught after the 1991 Subway robbery, defendant explained that he let a school acquaintance nicknamed "Kilo" store some marijuana in his school locker and the marijuana had been stolen. Kilo told him to either pay him some money or get the marijuana back. Defendant decided to rob the Subway store as an easy way to pay Kilo.

5. The August 30 Hearing and Romero Ruling

At the outset of the hearing on August 30, the court verified that counsel had in fact received the 1991 documents, and inquired whether the defense or prosecution wished to say anything before the court made its ruling on the Romero motion. Defense counsel responded: "I discussed it with [defendant]. We're prepared to go forward today." Cocounsel Fracchia, who had taken the lead in arguing the Romero motion, advised the court that he had gone through the material with defendant and was prepared to comment on it. He told the court that defendant's denial of a history of abuse in 1991 was in fact typical or common in families where such abuse had taken place, and was therefore not surprising or inconsistent with the information that had been presented in support of the Romero motion. After highlighting portions of the material that he argued were favorable to defendant's position, Fracchia concluded his argument by saying, "Submitted."

After the prosecution advised that it had not received the faxed documents, the court summarized their contents for the record, at one point characterizing the information in them concerning defendant's relationship with his father as being "in stark contrast to the evidence that was presented during the Romero hearing." The court went on to explain at length the legal framework and factual basis for its decision to deny defendant's motion. It discussed the particulars of the 1997 crimes, the fear in which he put his victims, and the fact that the robberies were committed less than a year after defendant had gotten out of prison for the 1993 robberies. The court went on to describe the circumstances of the 1991 and 1993 robberies, and the fact that the 1993 robberies occurred two weeks after defendant was released from the Rites of Passage program. The court stated: "It does appear that whenever he's not in custody, he's going to rob people, and that custody does not do anything to change his basic character." The court described defendant's family as an "intact family" in which both

parents were "there for him."  In that connection, the court contrasted Dr. White's information with the information family members provided "when the juvenile system was desperately trying to salvage this family and everybody was spilling out what was going on inside that household."  The court noted that defendant began stealing at an early age and that the "source of [his] pathology" has not been identified.

Although acknowledging that defendant may have gotten older and more mature, and that he seemed to be trying to help people inside the justice system and educate himself, the court concluded that granting the motion would nonetheless not be in furtherance of justice.  As the court summed up its reasoning, "The Court has stated that when he's not in custody, he robs people.  This seems to be the type of person that the three strikes law was meant for.  He's demonstrated by his conduct that he poses a great danger to public safety. [¶] Therefore this Court will conclude that the balance between punishment and mercy in this case must weigh in favor of public safety.  And this Court will conclude that it would be an abuse of discretion to grant the motion...."

D. The Sentencing Hearing

After a few postponements, the sentencing hearing was set for December 9, 2005.  On December 7, defendant filed a motion to continue the hearing so that he could raise objections to the trial court's taking of judicial notice of the 1991 juvenile court documents.  Defense counsel explained that the motion was filed late because counsel erroneously believed that sentencing had been scheduled for December 16.  The prosecution opposed any continuance, and submitted written arguments supporting the propriety of the trial court's decision to take judicial notice of the juvenile court documents.

At the December 9 hearing, the trial court denied the defense motion for a continuance, but permitted defendant to offer arguments on the issue of whether it had erred in taking judicial notice of the 1991 probation report.  Following argument, the court rejected defendant's position on the following grounds: (1) defendant had waived any objection to its taking judicial notice of the report; (2) the report was based on the same type of family member interviews that Dr. White had relied on in developing her psychosocial history; (3) the report was not a secret and it would have been available to Dr. White and the defense had they thought to request it; FN4 and (4) *the court had substantial other evidence before it regarding defendant's record and the facts of the robberies that supported a denial of the* <u>*Romero*</u> *motion.*

> FN4. The court took no issue with defense counsel's representation that neither he nor Mr. Fracchia nor

1

2

> Dr. White had ever seen the 1991 probation report
> before receiving the court's August 29 fax.

3

> The trial court sentenced defendant to a total indeterminate term of
> 125 years to life, plus a consecutive, determinate term of eight
> years.  Defendant timely appealed.

4

5  Opp., Ex. A (dkt. # 28-1), pp.  6-12 (emphasis added).

6     The state appellate court addressed petitioner's claim regarding the court's

7  reliance on the 1991 probation department report as follows:

8

> Defendant contends that the trial court prejudicially erred in taking
> judicial notice of, and in relying on, hearsay statements contained
> in the 1991 probation department report.

9

10

> *We find no cognizable error and no prejudice.  First, defendant*
> *waived his present claim by failing to raise it at the time the trial*
> *court decided his* Romero *motion.  Second, defendant was not*
> *prejudiced by any assumed trial court error in considering the*
> *1991 document.  The trial court did not in fact rely on the 1991*
> *report, and did not abuse its discretion in deciding to deny*
> *defendant's motion.  To the contrary, it would have been an abuse*
> *of discretion to grant the motion regardless of the truth or falsity*
> *of the matters asserted in the document.*

11

12

13

14

15

> The final Romero hearing began at 3:00 p.m. on August 30, 2005.
> Defendant was represented by two attorneys at the hearing, Carl
> Spieckerman and Robert Fracchia.  Copies of the documents to be
> judicially noticed had been faxed separately to both defense
> attorneys the previous afternoon.  Both attorneys stated on the
> record that they had gone through the material with the defendant
> before the hearing.  Attorney Spieckerman specifically advised the
> court that defendant was prepared to go forward with the hearing,
> and attorney Fracchia proceeded to make arguments addressed to
> the contents of the probation report.  Defense counsel submitted
> the Romero issue for decision without raising any objection to the
> trial court taking judicial notice of it and without requesting a
> continuance to further consider or present argument on the issue of
> judicial notice.  Counsel also made no objection after the trial court
> summarized the contents of the probation report or announced its
> decision to deny the Romero motion.

16

17

18

19

20

21

22

23

> Defendant first raised objection to the court taking judicial notice
> of the probation report on the eve of his sentencing hearing, more
> than three months after the Romero issue had been decided against
> him. This was too late to preserve the issue for appellate review.
> (Evid.Code, § 353; People v. Welch (1972) 8 Cal.3d 106, 114-115;
> Younan v. Caruso (1996) 51 Cal.App.4th 401, 406, fn. 3.)  That the

24

25

26

trial court addressed the merits of the judicial notice issue at the December 9 hearing out of an abundance of caution does not relieve defendant of his waiver. As the prosecution argued and the court specifically found at the time, defendant had already waived objection by the time of that hearing.

*Even assuming for the sake of analysis that defendant had not forfeited his right to appellate review of the judicial notice issue, and that the trial court erred in considering it, defendant still fails to establish that he was prejudiced. Whether defendant did or did not suffer abuse as a child was simply not a material factor in the court's decision to deny his* Romero *motion, nor should it have been.*

The purpose of the Three Strikes law is to provide longer sentences to, and greater protection to the public from, habitual or " 'revolving door' " criminals. (See People v. Strong (2001) 87 Cal.App.4th 328, 331-332.) Defendant had the burden of convincing the trial court that the Three Strikes statute should not be enforced against him because the nature and circumstances of his present offenses and prior convictions, and the particulars of his background, character, and prospects, took him outside the spirit of that law. ( People v. McGlothin (1998) 67 Cal.App.4th 468, 473-474.) As the trial court fully recognized, the striking of a prior strike conviction is not to be done lightly. It is an extraordinary exercise of discretion comparable to the setting aside of a judgment of conviction after trial. ( Id. at p. 474.)

The trial court provided a detailed explication of its reasons for denying defendant's motion, including a recitation of the facts of defendant's crimes and of his criminal history. Among other things, the court observed that the 1997 robberies were "extraordinarily serious" crimes that inflicted emotional injury on and "terrorized" the victims, and were carried out in a manner that showed criminal sophistication. The facts of defendant's 1991 and 1993 robberies showed equal callousness toward the victims. The court observed, moreover, that neither defendant's experience in Rites of Passage nor his incarceration for the 1993 robberies caused him to hesitate before going on to commit further serious crimes. The 1993 crimes occurred two weeks after defendant's release from juvenile supervision for the 1991 offense. Following his incarceration for the 1993 crimes, defendant had full family support and was going to school and working, yet, as the court recounted, within a year after his release from CYA defendant threw this opportunity away as well, and committed the 1997 robberies. As the trial court aptly summed it up, "custody does not do anything to change his basic character."

Regarding defendant's background, the court noted that he came from an "intact family" and experienced both the benefit and detriment of traveling to different places and living in different

countries.  Although the court mentioned that the mother's in-court description of the father as a "terror" was in direct contrast with what was stated in the 1991 probation report, it did not purport to decide which version was closer to the truth or to rely on one version over another in arriving at its conclusions.  Instead, it is apparent from reading its statement of reasons that the court's decision was driven by the serious nature of defendant's offenses, by his confirmed pattern of recidivism, and by the court's well-founded unwillingness to expose the public to the danger that defendant's claim of inner transformation was simply another stratagem for manipulating the system.  FN5

> FN5. On cross-examination, Dr. White admitted that she agreed with doctors who had examined defendant in 2002 that he was feigning mental illness at that time in order to have himself declared incompetent to stand trial.  According to his 1993 presentence report, defendant had expressed remorse for the emotional trauma he caused to his 1993 victims.

*The trial court stated that it would have been an abuse of discretion to grant defendant's motion.  In our view, that statement would still have been true even if the 1991 probation report had never surfaced.  Even if accepted at face value, defendant's claim of past child abuse neither excuses his past pattern of criminality nor outweighs the danger to which the public would be exposed if he is released.* FN6

> FN6. Although we need not address the merits of defendant's evidentiary error claim, we do note that his hearsay objection to the consideration of his statements to the probation officer is not well taken.  Defendant's own admissions are not hearsay, and since there is no dispute over the accuracy of the probation officer's report of those statements, the trial court was entitled to consider them for sentencing purposes.  (Evid.Code, §§ 452, subd. (d), 1220; People v. Lamb (1999) 76 Cal.App.4th 664, 683.)  In light of the latitude given to sentencing judges to consider "responsible unsworn or out-of-court statements [about the defendant's life]" so long as there is a "substantial basis" for believing them reliable ( People v. Lamb, at p. 683), even reliance on the 1991 statements of defendant's parents might have been permissible.  However, since there were ample other facts in the record that compelled the denial of defendant's motion, we need not determine whether the reliability standard was met.

Id., at 12-15 (emphasis added).

15

1      Although petitioner's counsel argued valiantly both within the motion papers and

2 at the court hearing, good cause is not shown for which this court should direct that the subpoena

3 sought be issued.   In Estelle v. McGuire, the Supreme Court reversed the decision of the Court

4 of Appeals for the Ninth Circuit, which had granted federal habeas relief.  The Court held that the

5 Ninth Circuit erred in concluding that the evidence was incorrectly admitted under state law since

6 "it is not the province of a federal habeas court to reexamine state court determinations on state

7 law questions."  Id. at 67-68, 112 S. Ct. at 480.  The Estelle Court re-emphasized that "federal

8 habeas corpus relief does not lie for error in state law."  Id. at 67, 112 S. Ct. at 480, citing Lewis

9 v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092, 3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104

10 S. Ct. 871, 874-75 (1984) (federal courts may not grant habeas relief where the sole ground

11 presented involves a perceived error of state law, unless said error is so egregious as to amount to

12 a violation of the Due Process or Equal Protection clauses of the Fourteenth Amendment).  See

13 also, Wilson v. Corcoran, ___ U.S. ___, 131 S. Ct. 13, 16 ("it is only noncompliance with *federal*

14 law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."

15 [Emphasis in original]).

16      The Supreme Court further noted that the standard of review for a federal habeas

17 court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

18 the United States (citations omitted)."  Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

19 order for error in the state trial proceedings to reach the level of a due process violation, the error

20 had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

21 defined the category of infractions that violate "fundamental fairness" very narrowly.'"  Id. at 73,

22 112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

23 or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp,

24 926 F.2d 918, 919 (9th Cir. 1991).

25      The state appellate court's definitive analysis of the trial court's ruling on the

26 Romero motion binds this court.  As set forth above, the state appellate court determined that the

trial court had not relied on the 1991 probation report in denying the <u>Romero</u> motion and further

that it would have been an abuse of discretion to have granted it, regardless of whether or not the

report contained false information.  Even though finding that petitioner had waived his right to

object to the trial court's judicial notice of the 1991 probation report,[5] as amplified above, the

state court of appeals made clear that even if petitioner had not forfeited his right to appeal the

issue and even if it had been trial court error to consider it, petitioner did not establish that he was

thereby prejudiced.  The state appellate court made clear that any history of child abuse petitioner

may have suffered was not only not material to the denial of the <u>Romero</u> motion by the trial

court, it *should not have been*, given his overall record.  In other words, petitioner could not rely

on any history of child abuse to have rendered a different ruling as any such history could not

have reached the requisite level to show he was prejudiced thereby in the trial court's ruling.  In

essence, the state appellate court found it would have been an abuse of discretion by the trial

court to have granted the <u>Romero</u> motion because any such abuse would not have constituted

carte blanche for petitioner to have engaged in the numerous prior robberies.  As noted, to show

any entitlement to the discovery at issue, petitioner's claim must implicate the sentencing

decision as having been significantly based on information that was materially untrue.  <u>Tucker</u>,

<u>supra</u>, at 447, 92 S. Ct. at 592.   Because, under <u>Estelle</u>, <u>supra</u>, this court cannot debate the state

appellate court's decision concluding that it would and should have made no difference to the

ruling on the <u>Romero</u> report whether or not the 1991 probation report contained accurate

information, the undersigned finds good cause is not shown for seeking discovery to show

---

[5] The finding that petitioner had forfeited his right to challenge the trial court's judicial notice of the 1991 probation report by failing to object timely would appear to present a separate hurdle for petitioner in the form of a procedural bar inasmuch as "[i]t is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" <u>Cone v. Bell</u>, ___ U.S. ___, 129 S. Ct. 1769, 1780 (2009), quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); <u>Lee v. Kemna</u>, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002

1    inaccuracy of the information regarding petitioner's child abuse history contained therein.[6]  In

2    other words, giving appropriate AEDPA deference to the state Court of Appeal, the sentence *was*

3    *not based* on the disputed information, nor could it have been.

4              Finally, petitioner sought an extension of time to file an amended petition based

5    on how the court might rule on the discovery and/or request for funds for expert services.  By

6    order, filed on August 11, 2010, the motion for a time extension was vacated and instead the time

7    for filing an amended petition was tolled pending further order of the court.   The court finds that

8    there is no basis for a claim of ineffective assistance of counsel centered on ineffectively

9    addressing or on failing to obviate the judge's alleged reliance on misleading statements in the

10    1991 juvenile probation report.  As the undersigned stated at the hearing on the motion the Ninth

11    Circuit has said there is no <u>Strickland</u>[7] claim for noncapital sentencing with respect to a potential

12    IAC claim in <u>Davis v. Grigas</u>, 443 F.3d 1155, 1158 (9th Cir. 2006) ("the Supreme Court has not

---

13

14        [6] In any event, this court's review of the record of the proceedings at the <u>Romero</u> hearing
before the sentencing judge indicates that Dr. White did testify about the incident that forms the

15    basis for petitioner's request.  In expanding an answer regarding physical abuse in the form of
beatings petitioner had allegedly suffered as a child within his family, the following exchange

16    occurred between one of petitioner's defense counsel, Mr. Fracchia, appointed to present the
<u>Romero</u> motion, and petitioner's expert witness, Dr. White, who conducted an investigation and
prepared a psychosocial evaluation concerning petitioner's background (AP (dkt. # 4, p. 42):

17          "Q.  And was there any indication that this was something that had
been brought to the attention of persons beyond his immediate

18          family?

19          A.  Yes.  When he was still, I think, in elementary school, he was
taking swimming lessons, and the swimming coach had contacted
the police about the marks on the skin.  And the police came and

20          spoke to the mother during - - um, during his time at the swimming
pool and indicated it was not appropriate behavior, not appropriate

21          to discipline a child in this way."

22    AP (dkt. # 4, pp. 79: 7-17).

23        Whether noted or not therefore in the trial judge's remarks at the point of
sentencing, there appears to have been some reference to the incident involving the report to

24    police arising from petitioner's being observed at a swimming pool as a youngster with some
skin marks.   The incident is also likely to have been included in Dr. White's report which was

25    submitted to the court.

26        [7] <u>Strickland v. Washington</u>, 466 U.S. 668, 694, 104 S.Ct. 2052 (1984).

1  delineated a standard which should apply to ineffective assistance of counsel claims in noncapital

2  sentencing cases.")[8]  Secondarily, even if such a claim for ineffective assistance was cognizable,

3  again, no prejudice could be shown because the appellate court reasonably found that the

4  probation report at issue was immaterial to the sentence.

5            Accordingly, IT IS ORDERED that:

6            1.  Petitioner's June 28, 2010 (docket # 27) motion for discovery is denied, as is

7  any leave to amend to set forth a claim of ineffective assistance of counsel;

8            2. Associated funding requests related to the denied discovery are also denied;

9            3. The ruling on this discovery motion forecasts the court's ruling on the merits;

10 nevertheless, this order does not make the final ruling on the merits;

11           4.  Petitioner is granted twenty-eight days to file any supplemental points and

12 authorities to the operative amended petition filed by petitioner pro se; thereafter, respondent will

13 have twenty-eight days to file a response; including any procedural default dispositive motion.

14 Respondent's response shall contain the standard elements of an answer.  Petitioner must file any

15 reply to respondent's opposition/answer within fourteen days thereafter.

16 DATED: 01/28/11                    /s/ Gregory G. Hollows

17 _____

        GREGORY G. HOLLOWS
18      UNITED STATES MAGISTRATE JUDGE

19 GGH:009
   nesb2821.ord3

20

21

22

_____

23      [8] In addition, the record indicates petitioner raised the possibility of an ineffective
   assistance of counsel claim on his own before the sentencing judge with regard to the way in
24 which the judge's alleged reliance on the 1991 juvenile probation report was handled.  AP (dkt. #
   4-1, pp. 96-99.  This court is hard put to see how a petitioner could proceed on a claim which
25 petitioner recognized and sought to pursue at the time of his sentencing but which evidently
   remains unexhausted at this point.

26