1
2
3
4
5
6
7
8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT HAYDEN NESBITT, JR.,

11                Petitioner,                    No. CIV S-09-2821 GEB GGH P

12        vs.

13   FRANCISCO JACQUEZ, Warden,

14                Respondent.           FINDINGS & RECOMMENDATIONS

15   _____/

16   I. Introduction

17           Although petitioner is currently proceeding pro se in this application for writ of

18   habeas corpus, he was appointed counsel, who fully briefed the issues, after which she moved to

19   withdraw at petitioner's request, which motion was granted.  Petitioner, after pleading no contest

20   to ten counts of second degree robbery, was sentenced to a term of 133 years to life under the

21   "three strikes law" in Solano County Superior Court on December 9, 2005.  Amended Petition

22   (AP) at docket # 4, pp. 1, 8; Answer, Exhibit (Ex.) B, Reporter's Transcript (RT), December 9,

23   2005, pp. 47-48.  Petitioner sets forth in the operative amended petition (filed while petitioner

24   proceeded pro se), the following as his sole challenge to the sentence: "the state trial court and

25   court of appeal unreasonably applied established federal constitutional law when it decided that

26   petitioner was not entitled to a fair sentencing hearing."  Id., at 4.  In supplemental points and

1

authorities submitted by then-counsel for petitioner, the single claim was more precisely articulated as: "the sentencing court violated his right to due process when it considered unreliable hearsay in a juvenile probation report," citing Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197,1204 [] (1977) ("it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause"); Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539 [] (1980)(hearsay statement of unavailable witness "admissible only if it bears adequate 'indicia of reliability'").[1]  Petitioner's Points & Authorities (Ptnr's. P. & A. at docket # 44, p. 1.  After a careful review of the record, the court recommends that the petition be denied.

## II. AEDPA

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

\\\\\

---

[1] Ohio v. Roberts was abrogated by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 ( ) to the extent that it was found that the Sixth Amendment confrontation clause was violated by the admission of any out-of-court statement by an unavailable witness who had not been  subjected to cross-examination.

1       As a preliminary matter, the Supreme Court has recently held and reconfirmed

2  "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to

3  have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S.Ct. 770, 785 (2011).

4  Rather, "when a federal claim has been presented to a state court and the state court has denied

5  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

6  of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris

7  v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when

8  it is unclear whether a decision appearing to rest on federal grounds was decided on another

9  basis). "The presumption may be overcome when there is reason to think some other explanation

10  for the state court's decision is more likely." Id. at 785.

11       The Supreme Court has set forth the operative standard for federal habeas review

12  of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an

13  *unreasonable* application of federal law is different from an *incorrect* application of federal

14  law.'" Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120

15  S.Ct. 1495 (2000). "A state court's determination that a claim lacks merit precludes federal

16  habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

17  decision." Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

18  Accordingly, "a habeas court must determine what arguments or theories supported or . . could

19  have supported[] the state court's decision; and then it must ask whether it is possible fairminded

20  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

21  decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires

22  considering the rule's specificity. The more general the rule, the more leeway courts have in

23  reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this

24  standard, which "stops short of imposing a complete bar of federal court relitigation of claims

25  already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a

26  strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.,

1   citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

2        The undersigned also finds that the same deference is paid to the factual

3   determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

4   presumed to be correct subject only to a review of the record which demonstrates that the factual

5   finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

6   light of the evidence presented in the state court proceeding."  It makes no sense to interpret

7   "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

8   § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

9   same record could not abide by the state court factual determination.  A petitioner must show

10  clearly and convincingly that the factual determination is unreasonable.  See <u>Rice v. Collins</u>, 546

11  U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

12       The habeas corpus petitioner bears the burden of demonstrating the objectively

13  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

14  <u>Woodford v. Viscotti</u>, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

15  show that the state court's ruling on the claim being presented in federal court was so lacking in

16  justification that there was an error well understood and comprehended in existing law beyond

17  any possibility for fairminded disagreement."  <u>Harrington</u>, <u>supra</u>, 131 S.Ct. at 786-787.  "Clearly

18  established" law is law that has been "squarely addressed" by the United States Supreme Court.

19  <u>Wright v. Van Patten</u>, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

20  settled law to unique situations will not qualify as clearly established.  See <u>e.g.</u>, <u>Carey v.</u>

21  <u>Musladin</u>, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state

22  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

23  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

24  established law when spectators' conduct is the alleged cause of bias injection).  The established

25  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or

26  other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

1   federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

2          The state courts need not have cited to federal authority, or even have indicated

3   awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S.Ct.

4   at 365.  Where the state courts have not addressed the constitutional issue in dispute in any

5   reasoned opinion, the federal court will independently review the record in adjudication of that

6   issue.  "Independent review of the record is not de novo review of the constitutional issue, but

7   rather, the only method by which we can determine whether a silent state court decision is

8   objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

9          Finally, if the state courts have not adjudicated the merits of the federal issue, no

10   AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

11   James v. Ryan, __ F.3d __, 2012 WL 639292 *18-*19 (9th Cir. 2012).

12   III. Background

13          As this court has previously stated in adjudicating petitioner's discovery motion in

14   this matter, "the undersigned has reviewed the entire Romero motion and underlying

15   proceedings, including the testimony, argument and sentencing, as well as petitioner's copy of

16   the 1991 juvenile probation report at issue."  See Order, p. 7, filed on January 28, 2011 at docket

17   # 34.  In doing so, this court's independent review of the record has previously confirmed the

18   2007 state appellate court summary of the background to the Romero motion and its accuracy

19   with regard to the witness testimony and other evidence presented at the hearing, as well as the

20   argument and decision on the motion.  Id.  In the unpublished decision, the state appellate court

21   correctly summarized the procedural background, as follows:

22          Defendant was charged with and eventually pleaded no contest to
            10 counts of second degree robbery (Pen.Code,1 § 211; counts I
23          and III through XI), being a felon in possession of a firearm (§
            12021, subd. (a)(1); count II), and conspiracy to commit robbery
24          (§§ 182, subd. (a)(1), 211; count XII). The robberies all occurred
            between May 23 and July 7, 1997. Defendant was further charged
25          with and admitted the following special allegations: (1) as to count
            I, that he personally used a firearm (§§ 1203.06, subd. (a)(1),
26          12022.5); (2) as to counts I and III through XI, that he had a prior

serious felony conviction (§ 667, subd. (a)(1)); and (3) as to counts I through XII, that he had six prior strike convictions (§ 667, subds.(b)-(I)), all of which were for robbery (§ 211).

People v. Nesbitt, 2007 WL 2110983 *1 (Cal. Ct. App. July 24, 2007)(unpub. op.).

The state appellate court also summarized the factual background of the 1997 offenses "from the presentence report:"

Counts I and II: On May 23, 1997, defendant entered a Round Table Pizza restaurant, grabbed a $20 bill off the counter, and asked the employee, "Are you in charge?" He told the employee to open the safe, and said he had a gun. Defendant asked again, "Are you in charge?" and said, "I'm fixin' to rob you." The employee falsely told defendant that some customers sitting at a table were the restaurant's managers and owners.  Defendant walked the employee over to the table.  After a brief conversation with the customers, defendant said, "I'm tired of this, I want your fuckin' money."  When defendant stepped behind the employee the two began to grapple and the employee saw that defendant had a large chrome revolver with the hammer cocked back, so he let go of defendant. The employee told defendant he would give him the change and asked him not to shoot him because "he had a kid." Defendant, holding the gun and pointing it at the employee, fled the store. The handgun described by witnesses was recovered later that day after defendant fled from police. It had five live rounds and one expended round in the cylinder.

Count III: On May 28, 1997, defendant entered a Bank of the West, approached a teller, and stated, "I want to make a withdrawal. Give me all the money in the register. You have 15 seconds or I'll blow your fucking brain out." He took the money, placed it in a black bag, and fled. The bank's loss was $6,215.

Counts IV through VII: On June 20, 1997, defendant and a codefendant, Adam Powell, entered a Home Savings Bank branch and approached the teller window. Defendant told the teller he wanted to make a withdrawal. He took his backpack off, placed it on the counter, and stated, "Give me you[r] fucking money." As the teller emptied her drawer, defendant told her, "[You're] running out of time," and "[h]urry up."  Defendant ordered a second teller to do the same.  During these events, defendant was holding something in his hand that was covered by a white handkerchief. While the second teller gave defendant money, Powell jumped over the counter and robbed two other tellers from behind the counter. Both men then fled the scene. The bank's total loss was $10,194.17.

Counts VIII and IX: On June 25, 1997, defendant and Powell entered the Surety Bank.  Defendant placed a bag on the teller

counter, and told the teller, "Give me all your money." When the teller said she was afraid, defendant repeated his demand in a louder voice, vaulted over the counter, and again shouted, "Give me all your money." The teller pulled money from her drawer and defendant put it in his bag.  After walking over to Powell, defendant returned to the same teller and demanded more money. The teller gave him additional money from merchant courier bags she had previously been counting.  Defendant and Powell fled the scene. The bank's total losses had not been determined at the time the sentencing report was prepared.  According to an employee, the robbery had a strong and lasting emotional impact on the tellers, especially due to defendant and Powell jumping over the counter and taking control of their workspace.

Counts X and XI: On July 7, 1997, defendant and Powell entered the same Bank of the West branch defendant had robbed on May 28, approached the teller windows, vaulted into the teller area, and demanded money from the tellers. Witnesses reported that the robbers said, "It's all right, just relax, give me all your money," and "Hurry up, you're taking too long."  Defendant and Powell fled the scene with $22,023.16.

Count XII: This conspiracy count listed nine overt acts relating to counts IV through XI.

People v. Nesbitt,  2007 WL 2110983 at *1-*2 (Cal. Ct. App. July 24, 2007); see also, Pre-Sentence Report, Respondent's Lodged Documents, Exhibit A, Clerk's Transcript (CT) at 767-773.

        The state appellate court concisely and accurately summarizes the background of the Romero motion at issue herein:

        [] The Romero Motion

        After protracted pretrial proceedings, defendant pleaded no contest to all charges and admitted the special allegations on October 6, 2003.  The parties agreed there were no promises regarding sentencing and that defense counsel would be filing a Romero motion.  Defendant acknowledged that he could receive a maximum sentence of 360 years to life in prison.  Immediately after filing his Romero motion, defendant moved to set aside his plea.  At defendant's request, a second attorney was appointed to review his plea agreement and Romero motion.  In February 2005, defendant's second counsel, Robert Fracchia, advised the court that defendant would not pursue his motion to withdraw his plea, but that he wished to submit supplementary materials in support of his Romero motion.  Defendant thereafter filed several supplemental

7

1

2

3

4

> documents in support of his *Romero* motion, including: a
> psychosocial history prepared by Dr. Gretchen E. White, a clinical
> psychologist retained by the defense; defendant's own report as to
> his personal development during the period of his incarceration;
> and a declaration by a county official as to defendant's conduct at
> the jail.

5   People v. Nesbitt, 2007 WL 2110983 at *3 (Cal. Ct. App. July 24, 2007); see also, respondent's

6   Lodged Document, Exhibit B, Reporter's Transcript (RT), October 6, 2003; RT, November 15,

7   2004; RT, February 10, 2005; RT, July 29, 2005; RT, Aug. 5, 2005; respondent's Lodged

8   Documents, Ex. A, Clerk's Transcript (CT) (vol II), pp. 653- 671, 673-690, 692-693.

9          The record shows that petitioner's counsel, through the testimony of a Dr.

10   Gretchen White, who prepared a psychosocial history for petitioner,[2] and through the testimony

11   of petitioner's mother that presented petitioner as a victim of severe abuse, both physical and

12   psychological, by his parents, especially his father.  Ptnr. P&A, p. 2; respondent's Ex. B, RT,

13   July 29, 2005 & RT, August 5, 2005.   Under cross-examination, respondent questioned Dr.

14   White's analysis based, in part, on reports of other professional evaluators in the record.[3]

15   Petitioner also presented evidence of rehabilitation and of his having matured through the

16   testimony of several Solano County Sheriff's Department jail officers.  RT, July 29, 2005.

17          As the state appellate court stated in more detail with regard to petitioner's

18   psychosocial history:

19

20

21

22

23

> On July 29, August 5, and August 26, 2005, the trial court heard
> evidence and argument on defendant's *Romero* motion.  Dr. White
> testified about her written psychosocial history, which included
> allegations that defendant had suffered extreme physical and
> psychological abuse at the hands of his father. According to the
> report, defendant was beaten with a belt a minimum of three times
> per week from a very early age.  He would be punished for making
> extremely minor mistakes, such as dropping food on the floor.

24          [2] Dr. White's report is included in respondent's Ex. A, CT, vol. II, pp. 653-671.

25          [3] The prosecutor also asked her: "Is it fair to say that your understanding of this

26   defendant's background and how he grew up is almost based entirely on what his family and this
defendant have told you?"  Dr. White's answer was "Yes."  RT, Aug. 5, 2005, p. 8.

Defendant had to have permission from his father for everything, including getting a glass of water.  He was so afraid of his father that he would sometimes drink water from the toilet rather than approach his father.  Defendant was constantly under restrictions from his parents to the point that he was unable to make friends or play team sports.  Due to the father's financial irresponsibility, defendant and his brother also had few toys and could not afford to participate in organized activities outside the home such as the Boy Scouts.  At about six years of age, defendant began running away.  According to defendant's mother, defendant ran away at least twice a year until he was about 14 years old, and would stay away for one to three days, sometimes staying in parks and libraries.

Both parents were career United States Air Force personnel and military mores had a significant effect on their thinking. According to defendant's father, they tended to see things in "black and white" terms. The family also moved frequently, increasing defendant's social isolation and resulting in dramatic changes in the socioeconomic and racial make-ups of the neighborhoods in which he lived. According to Dr. White, the combination of factors in defendant's upbringing caused him to internalize a very punitive attitude toward himself, and to exhibit excessive anger and strong tendencies toward impulsivity as well as self-sabotage. On the latter point, she opined that when defendant was on the verge of succeeding he would assume that since his success would not affect his parents' attitude toward him he would "get back at them by messing up."

Dr. White's psychosocial history of defendant also referenced a serious automobile accident that occurred when defendant was 15 years old.  He was riding in a car with schoolmates that flipped over three times.  Defendant was thrown from the vehicle and suffered severe injuries and a period of apparent depression. It was shortly after this accident that defendant committed the armed robbery for which he was sent to Rites of Passage.

Defendant's mother testified about the beatings to which defendant had assertedly been subjected, his pattern of running away from home, the restrictions and controls placed on him by his father, and the physical and emotional effects of the car accident that occurred when he was 15. His father was present at the hearing but did not testify. According to Dr. White, when she interviewed defendant's father he minimized the alleged abuse that defendant had experienced. She never asked him about the mother's specific claims of abuse, such as the regular beatings and extreme strictness over minor infractions.

People v. Nesbitt, 2007 WL 2110983 *3-*4 (Cal. Ct. App. July 24, 2007).

\\\\\

9

1        As to testimony regarding petitioner's "transformation while in custody," the state

2    appellate court summarized the record as follows:

> Other witnesses testified about defendant's personal growth during
> his incarceration in the county jail and about the positive effect he
> had on other inmates. [] Stanley Maynard met defendant through
> his stepson, who was defendant's cellmate. Maynard found him to
> be sincere, intelligent, and very supportive of others. Former
> inmate Leroy Comier testified that defendant helped him grow,
> mature mentally, take responsibility for his criminal conduct, and
> better himself. Philip Norris had known defendant for about 11
> years, dating from defendant's CYA confinement. He had seen
> tremendous changes in defendant, and had turned to defendant
> often for advice and guidance.
>
> Dr. Michael Castell had a Ph.D. in counseling psychology and had
> worked in the mental health field for 30 years. At the time of his
> testimony, he had been running inmate programs for the Solano
> County Sheriff's Office for eight years. He had his first counseling
> session with defendant at the end of 2000. He watched defendant
> go from being in an isolation unit for disciplinary reasons to being
> a model prisoner who was constantly striving to better himself in
> terms of his thinking, education, and behavior. According to
> Castell, defendant had read hundreds of books on serious subjects
> and was actively trying to grapple with issues of moral
> development and personal authenticity. He had taken a leadership
> role in the prison's life skills program for inmates. Castell had
> heard from several inmates that defendant helped them stay out of
> trouble.

People v. Nesbitt, 2007 WL 2110983 *4.

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

1  IV. Claim and Analysis

2  Claim - Due Process Violation at Sentencing [4]

3          Petitioner challenges his sentencing hearing as unfair because the

4  sentencing judge took judicial notice of, and relied on, evidence in a juvenile probation report

5  petitioner characterizes as unreliable.[5]  Petitioner's Points & Authorities at docket # 44, p. 1.  In

6  his pro se amended petition, petitioner summarized the factual support of his claim as:

7                  The trial court's erroneous taking of judicial notice of the
                statements within the 1991 probation report without affording the
8                  defense an[] opportunity to contest the reliability of the improperly
                notice[d] statements, eviscerated the defense presentation and
9                  denied his right to fair sentencing, thus violating his constitutional
                rights.

10

11  AP, p. 4.

12          Petitioner raises three subclaims in his pro se amended petition:

13   1) issue not waived where trial counsel requested continuance of the sentencing hearing to

14  address the court's improperly noticed matters and court ruled on the substantive issue of judicial

15  notice;

16  _____

17          [4]  While petitioner argues that AEDPA does not bar relief because the state appellate
court did not analyze petitioner's claim based on federal constitutional law, entitling petitioner to
18  de novo review, respondent contends that petitioner's claim of a due process violation was not
properly exhausted.   Ptnr. P&A (dkt # 44), p. 8; Answer (dkt # 46), p. 2, (dkt # 46-1), 22-23.
19  The court is not persuaded by either position.  As set forth, supra, state courts need not have cited
to federal authority, or even have indicated awareness of federal authority in arriving at their
20  decision.  Early, supra, 537 U.S. at 8, 123 S.Ct. at 365.  Moreover, as the court has also
previously noted, § 2254(d) does not require a state court to give reasons before its decision can
21  be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. at 785.
To the extent it could be argued that the state appellate report did not address the constitutional
22  issue in dispute in its reasoned opinion, this court has conducted an independent review of the
record.  In addition, a petition may be denied on the merits without exhaustion of state court
23  remedies.  28 U.S.C. § 2254(b)(2).  As will be shown, infra, petitioner's claim does not implicate
federal due process rights.

24          [5]  Petitioner has also framed the claim as: "the trial court violated his right to due process
and a fair sentencing hearing when it sua sponte reviewed a juvenile probation report as evidence
25  at the hearing on his motion to strike his prior convictions in the interests of justice pursuant to
People v. Superior Court (Romero), 13 Cal.4th 497[, 53 Cal. Rptr. 2d ]([Cal.] 1996)."  See
26  Order, filed on January 28, 2011, p. 2, quoting petitioner's Motion for Discovery, p. 3.

1  2) trial court erred by taking judicial notice of hearsay statements contained in the juvenile

2  probation report and relying on them as true in denying petitioner's <u>Romero</u> motion;

3  3) trial court's improper exercise of judicial notice of statements where statements accepted as

4  true prejudiced petitioner and violated his constitutional rights by eviscerating defense's ability to

5  make a presentation in support of the <u>Romero</u> motion and to contest the court's findings.  AP, pp.

6  19, 21, 25.

7         *1) Issue not waived where trial counsel requested continuance of the sentencing*
   *hearing to address the court's improperly noticed matters and court ruled on the*

8  *substantive issue of judicial notice*

9        Petitioner concedes that his trial counsel neither objected to proceeding with the

10 <u>Romero</u> hearing after the trial judge alerted counsel to the court's review of the subject [1991]

11 juvenile probation report nor objected to use of the probation report at the hearing's conclusion.

12 AP, p. 19.  However, petitioner asserts, his counsel's failure to object at that point did not result

13 in a waiver of the issues where counsel raised the impropriety to the court thereafter "and the

14 court addressed the merits of the objections."  <u>Id.</u>  Petitioner cites several California cases in an

15 effort to shore up his position: <u>People v. Wagoner</u>, 89 Cal. App.3d 605, 616[, 152 Cal. Rptr. 639]

16 [Ct. App. 1979 ]("[a]bsent an objection at the trial level to the contents of the probation report, a

17 defendant is deemed to have waived this issue"), citing <u>People v. Medina,</u> 78 Cal. App.3d 1000,

18 1007[, 144 Cal. Rptr. 581] [Ct. App. 1978] ("[u]nless the record shows an objection to allegedly

19 improper entries and an erroneous ruling thereon, the issue is simply not available on appeal")[6];

20 <u>People v. Evans</u>, 141 Cal. App.3d 1019[, 1021][,190 Cal. Rptr. 633] [(Ct. App. 1983)],  [1983]

21 ("any objection to the contents of a probation report or other material relied on by the sentencing

---

23     [6] It is also stated therein: "[t]he cases demonstrate that the inclusion of improper material
24 in a probation report does not necessarily lead to a reversal for the purpose of resentencing. In
   fact, the only criminal case in which that was the result is *People v. Romero*, *supra*.. In all other
   criminal cases the judgment was affirmed either because the prejudicial information was
25 adequately supported by other information, or because the appellate court concluded that the trial
   court had not relied on the objectionable parts of the report."  <u>People v. Medina</u>, 78 Cal. App. 3d
26 at 1007, 144 Cal. Rptr. 581 (Ct. App. 1978).

court must be made in the superior court or is waived")[7]; <u>People v. Santana</u>, 134 Cal. App. 3d 773[, 785][, 184 Cal. Rptr. 733] ([Ct. App.] 1982) (appellant cannot raise on appeal an argument regarding a failure of court or probation officer to give admonitions as to constitutional rights waived by admissions as to prior convictions, etc., which was not raised at sentencing hearing).

Petitioner points to the <u>Santana</u> court's explaining (in dicta) that had the point been raised below:

> the trial court could have done several things including (1) continuing the sentencing hearing to permit the district attorney to bring in authenticated official reports of the convictions and imposition of probation and parole as prima facie evidence of these events; and (2) permitting appellant at the continued hearing to bring in evidence to refute the reports of convictions, etc.

<u>Santana</u>, 134 Cal. App. 3d at 785, 184 Cal. Rptr. 733.

Petitioner contends that following the court's ruling denying the <u>Romero</u> motion, his counsel, "who had not read the probation report until after the court made her ruling," included in a motion to continue the sentencing hearing "a thorough discussion of the law on judicial notice and the impropriety of the court's action." AP, p. 20. Petitioner argues that neither of his attorneys knew precisely what the court would be taking judicial notice of, meaning the alleged "hearsay statements" in the probation report, and, because the court addressed the merits of his counsel's objection at the sentencing hearing, the issue was litigated and in the record for adjudication by the state appellate court. <u>Id.</u>, at 20-21.

\\\\\

---

[7] "Moreover," the <u>Evans</u> court went on to say, "the superior court committed no error. A sentencing court may consider material which would have been inadmissible on the issue of defendant's guilt ( *People v. Peterson* (1973) 9 Cal.3d 717, 725-728 [108 Cal.Rptr. 835, 511 P.2d 1187]; *People v. Hubbell* (1980) 108 Cal.App.3d 253, 256 [166 Cal.Rptr. 466]. The court may not consider material which it has no reason to believe is reliable, but here the court considered only court files and probation reports which are inherently reliable and which the court is required to consider (Pen. Code § 1203, subd. (b); *People v. Arbuckle* (1978) 22 Cal.3d 749, 755 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171]). Consideration of the codefendant's file was proper as it contained facts pertinent to Evans' role in the crime, a factor the court needed to consider in evaluating the mitigating and aggravating factors. (See Cal. Rules of Court, rules 421, 423.) Only proper material was considered at sentencing." <u>People v. Evans</u>, 141 Cal. App. 3d at 1021-22, 190 Cal. Rptr. 633.

1    The record indicates that the sentencing court heard evidence on petitioner's

2  *Romero* motion on July 29, 2005, and August 5, 2005.  Answer (dkt # 46-1), p. 12,[8] respondent's

3  Ex. B RT, July 29, 2005 & RT, August 5, 2005.  Petitioner argues that at the close of the

4  evidence presented at the Romero hearing, wherein the petitioner had presented evidence both of

5  severe physical and psychological abuse by his parents, particularly, his father, and substantial

6  evidence of his rehabilitation, the judge's words indicated she had not decided to deny the

7  motion based only on petitioner's criminal history, pointing out that she stated at that time: "I

8  think the *Romero* motion is distinctive...the court at this time doesn't know what the outcome is

9  going to be on the *Romero* motion."  Ptnr. P&A (dkt # 44), p. 3, quoting the Aug. 5, 2005 RT at

10  p. 98.[9]  Petitioner contends that later the sentencing court relied on materially inaccurate

11  information at the sentencing hearing.  Ptnr. P&A, pp. 2-3.  The court and the parties all

12  addressed the motion on Aug. 26, 2005, and the prosecutor, at the beginning, sought judicial

13  notice of several reports, inter alia, a report by a Dr. Purviance and one by a Dr. O'Meara, as well

14  as of petitioner's 1993 presentence report to which defense counsel did not object and which

15  request was granted.  Answer, p. 12, respondent's Ex. B, RT Aug. 26, 2005, pp. 1-52; id., 2-3.

16    Respondent observes that the court clarified with his defense counsel petitioner's

17  criminal history:

18    [I]n my own mind, it appears that Mr. Nesbit has three periods of
   robbery in his life.  The first was when he was a juvenile.  The
19    second was shortly after he was released from juvenile probation
   successfully.  In 1993 there was a series of robberies.  I think there

20

21    [8] The court's electronic pagination is referenced.

22    [9] In response to the question whether argument on the *Romero* motion and sentencing
   would both occur on the same day or not, the court responded: "I think the Romero motion is
23  distinctive enough and will consume enough time.  The Court at this time doesn't know what the
   outcome is going to be on the Romero motion.  I don't want to prepare a sentencing that may
24  change depending on the outcome of the Romero motion, unless there's some need to try and
   blend all of this at one time." Aug. 5, 2005 RT 98:6-12.  At which point counsel for petitioner
25  agreed that the Romero argument and sentencing should not occur on the same day and the judge
   determined that on August 26, 2005, the Romero arguments would be heard but sentencing
26  would not take place.  Id., at 98:13-23.

were about six robberies during that time.  And then after he was
released from prison there was another series of about five current
robberies, if you want to call them that, in 1997.  And those are the
ones for which he is before the Court for sentencing ultimately in
this matter.  But the prior set of robberies and the juvenile robbery
are the ones that make him a candidate for three strikes.

Answer (dkt # 46-1,  p. 12, quoting from RT, Aug. 26, 2005, p.7.

       Toward the end of the hearing on August 26, 2005, the judge disclosed on the record that she, like defendant, came from a military family, with a father who was "fairly harsh in his disciplinary techniques" although "[p]erhaps not as harsh as Mr. Nesbit's father... ."  RT, Aug. 26, 2005, pp. 42-43.  She described moving "all over the place" and sometimes being "one of the few blacks there" to being in an "all-black environment[]" and in "different socioeconomic situations."  Id., at 43.  She spoke of the social isolation of her family and of being subjected to economic deprivation and "racial indignities."  Id.  She indicated that while she had spoken about her background publicly, that did not mean that those before her at the hearing knew it, and she noted two distinctions in her background from that of petitioner: that she is female and "secondly, I do not think the level of physical abuse was quite as harsh as Mr. Nesbit suffered."  Id., at 44.

       On the final day of the Romero hearing, on August 30, 2005, the court stated that prior to addressing the motion to strike priors, that the court had had documents from petitioner's juvenile file faxed to counsel the day before.  RT, Aug. 30, 3005, p. 53; Ex. A, CT ("Confidential Documents"), pp. 698-730 (regarding juvenile file, case no. J23197).[10]   The judge stated that in preparing for the hearing:

       I noticed that there was something I had not had an opportunity to

---

[10] The July 29, 2005, fax transmittal contained the following message a court judicial assistant addressed to the prosecutor and both of petitioner's defense counsel: "Please be advised that Judge Garrett has taken judicial notice of Mr. Nesbitt's juvenile file, Case No. J23197. Attached for your review are three documents from Mr. Nesbitt's juvenile file, which Judge Garrett asked that I provide to all counsel before tomorrow's hearing."  Ex. A, CT ("Confidential Documents"), p. 698.

1       review.  And once I went through this and observed the detention
        report for the defendant's juvenile 211, as well as the dispositional
2       report, I thought it contained pertinent information that counsel
        should be aware of.  Because I have taken judicial notice of that, I
3       wanted to make sure that all attorneys had that information as well.

4

5   RT, Aug. 30, 3005, pp. 53-54.

6           In the court's exchange with counsel as to whether all counsel had the

7   information, the prosecutor stated that he had not yet seen it and the following exchange occurred

8   between the court and petitioner's two attorneys:

9       The Court: [] Mr. Spieckerman, did you receive the information?

10      Mr. Spieckerman: I saw it and got part way through it all.  I haven't
        read the whole thing.

11
        The Court: Mr. Fracchia, did you receive the information?
12
        Mr. Fracchia: I received it, and I read it twice, Your Honor.
13
        The Court: All right.  With that, I would like to find out if anyone
14      has anything else to say before the Court makes a final ruling in
        this matter.
15
        Mr. Spieckerman.
16
        Mr. Spieckerman: I discussed it with Mr. Nesbitt.  We're prepared
17      to go forward today.

18      The Court: Mr. Fracchia.

19      Mr. Fracchia: I met with Mr. Nesbitt this afternoon and gave him
        an opportunity to go through the information that the Court faxed.
20      I'm prepared to comment or have the Court make a ruling.

21      The Court: Do you have any comments to make at this time?

22      Mr. Fracchia: Much of what I got to see in the juvenile probation
        report, given the family's history, I don't think that Mr. Nesbitt's
23      denial of any history of abuse at that point in time in his life is
        unexpected.  It's not dissimilar to me to what I see in any number
24      of individuals who have been victimized and had families that are
        abusive.
25
        I felt some of the things, comments of interest about his family
26      talking about Mr. Nesbitt having, you know, undergone the LA

16

syndrome and his mother continuing with her belief that perhaps the young Robert at the time had a mental illness all were somewhat, again, consistent with what I would expect to have seen at that point in time.  I thought it was interesting to note that the report comments about the history of run-away behavior which apparently was continuing up to that point in his life.

Again, I did not find anything that struck me as overt or unusual other than the minor  - - the then minor's denial of [sic] history of abuse.  But given that circumstance, it did not surprise me.

It was also of note to me that that particular incident, that offense, again, was with a BB gun.  Again, although the victims certainly don't know the difference between a BB gun and a pistol, nevertheless, it was a BB gun.

And the only other thing I thought was somewhat interesting given Mr. Nesbitt's then absence of really any significant criminal history, it struck me as unusual that the probation department took such a severe step of placing him in the Youth Authority - - either the Youth Authority and/or Rite of Passage and ultimately Rite of Passage.

Submitted.

RT, Aug. 30, 2005, pp. 54-56.

The court then describes how the original detention report for the 1991 robbery "purported to summarize facts about the crime and information about the defendant's background":

He was a minor at the time.  The detention report talked about counseling that the father had tried to get the family into.  He described that as having no lasting impact.  He also described thefts that the defendant had been involved in that created problems for the family while he was a juvenile.

According to the father on page 3 of the detention report, he stated while living on base, his son was involved in a theft.  And as a result, they had him live with his grandparents in North Carolina during the three-month summer break.

Subsequently, in the dispositional report, it was explained that the reason he was sent to North Carolina was because his conduct on the base was jeopardizing the family's housing on the base, and they had to get him out of there so they wouldn't be kicked off the base.  They sent him to live with his grandparents.  According to the report, it stated, while he was living with his grandparents,

17

however, he got their keys and stole their car and was immediately returned home.

The father stated he felt that the family program that they had been involved in was good, and they were really trying to address Mr. Nesbitt's problems.  That everybody was benefiting [sic] from it, except for Mr. Nesbitt.

At the time, during the detention interview, the report stated that the minor attributed his present charges to having gotten caught up with the wrong people and described how he came to being in possession of the gun and why he committed the robbery.  Reading from page 3 of 4 in this report, it states, quote, "While the minor did not recognize any particular relationship problems with his parents, he did admit experiencing a great deal of conflict with them as a result of his school performance.  He described his mother as a mean disciplinarian and feels she has given up on him, but he believes his father still loves him.  He denied any history of physical or verbal abuse, though reports his mother will call him names when she's mad."

In the dispositional report, which was filed November 29, 1991, there was a great deal of information that was gleaned by the probation officer from the entire family.  The body of the report was 21 pages long.  And after a description of the crime that brought the defendant before the juvenile court, his explanation of why he did that, on page 6 of the report, it reads, quote, "After the incident, Robert was surprised that, quote, "he actually did this,'" close quote.  The minor reports one day lapsed before he was arrested.  And at that time, he thought he had gotten away with the robbery.

It went on to say he felt stupid with getting involved with the person who got him involved and quote, "Robert states he'll not do this again and is unclear if he had not been caught whether or not he would have committed another offense like this.  The minor reports that what would stop him from doing this again is what is happening now."  He stated that the incident affected the family very badly.  He believes his parents still love him after all that has been done.

The report described the sever [sic] trauma that the victim of the robbery experienced.  And she described what it felt like for her to live through that robbery and what the aftermath had been on her psychologically.

On page 9 of the dispositional report under family information, there's some interesting comments.  The report states that Robert currently lives with his natural mother, natural father and younger brother.  The minor reports that he shares an okay relationship with his mother.  He states that this relationship is good as long as he

18

does not get on her nerves.  He gets on her nerves by doing stupid things.  He states they have good communication as well as he's not acting dumb.  And it goes on to talk about what he likes about his mother.  What he dislikes about her is she nags when he does dumb things.  He says she's currently not working and trying to get a job at the police department as a clerk.

The most interesting is the defendant's description of his relationship with his father.  On page 9 at line 20, I read from the report, "Robert sees his relationship with his natural father as being, quote, 'great,'" closed quote.  Their communication is great.  And if Robert is willing to talk to his father, his father is willing to listen.  The minor reports that he does not expose himself to his father although sometimes he does communicate openly with him.  Their activities consist of playing basketball, watching basketball games on television and talking.

And the Court is reading this into the record because this is in stark contrast to the evidence that was presented during the Romero hearing regarding the dynamics between father and son, where father was described as terrorizing the defendant when he was a boy.

The report goes on to state again their activities consist of playing basketball, watching basketball games on television and talking.  What Robert likes about his father is how he acts younger than he is and is always making jokes even when he's upset.  Robert likes how his father praises him on certain things and how he helps him out.  What Robert dislikes about his father is that sometimes he has a bad temper.  His father gets in moods where he's mad at the minor.  Robert also dislikes when he works around the yard because his father always complains about his productive [sic].

---------------------------------------------------------------------------

The minor reports that the biggest problem with his parents is him not keeping his grades up.

Robert reports that his punishment mainly consists of restriction to his room and loss of privileges.  The minor states that he has received corporal punishment in the past, the last time being last year.  Robert says his mother will impose punishment.  His parents do not always agree, and he reports his dad is willing to give him a break.

---------------------------------------------------------------------------

The minor reports he has never been physically or sexually abused.

RT, Aug. 30, 2005, pp. 56-61.

The court noted that in the report petitioner thought his behavior at home was generally pretty good but that he had run away about seven times, that his father believed himself to be a positive role model for petitioner, but that he thought petitioner was closer to his mother, while his mother, in her turn, indicated she was getting petitioner a mental health evaluation and that his relationship with his father was good. Id., at 59-62.

In denying the motion, the court then stated:

> This Court has been asked to use the power under Penal Code section 1385 to strike prior robberies so that the defendant may have a determinate sentence. The controlling principles have been set out in a number of cases. On of the cases is People versus McGlothin. The cite is 67 Cal.App. 4th 468. And that case cites People versus Williams, 1998, California Supreme Court case, 17 Cal.4th 148.
>
> The Court has stated, both the First District Court of Appeals and the Supreme Court, that in ruling whether to strike or vacate a prior serious or violent felony conviction, in furtherance of justice, pursuant to Penal Code section 1385, the Court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character and prospects, the defendant may be deemed outside the scheme's spirit in whole or in part, and hence should be treated as though he had presently not committed one or more felonies and/or had not been previously convicted of one or more serious or violent felonies. That is the general statement of the guiding principle to which the Court must adhere.
>
> The Court stated on page 474 that the striking of a prior serious violent felony conviction is not a routine matter. It is an extraordinary exercise of discretion, and is very much like setting aside a judgment of conviction after trial. The Court stated in McGlothin that, in reviewing this decision, you must follow the Supreme Court's direction to consider the nature and circumstances of the present crimes, the defendant's prior convictions, his background, his character, and his prospect. And that the Court must look at all of those in deciding how best to exercise its discretion.
>
> On page 476, the First District Court of Appeals stated that our system of laws confers upon each judge the discretion necessary to weight punishment and mercy, to find that exquisite balance in which a just sentence reposes. Yet, in a democracy, the scope of a judge's authority is encompassed by the judgment of the citizens who bestow on the judiciary its authority in the first instance. And

under our statutory framework, judges are not empowered to fashion any sentence they choose. The Legislature has created a sentencing structure within which every court must operate. Both the legislature and the People, by initiative, have adopted a particular sentencing scheme for repeat offenders. A court may not simply substitute its own opinion about what would be a better policy, or a more appropriately calibrated system of punishment, in place of that articulated by the People from whom the court's authority flows.

This Court in looking at those general principles has examined the facts of the present crimes. Those are set forth in the probation report. The Court notes the defendant committed a robbery of Round Table Pizza with the use of what appeared to be, I believe that was, an actual gun, and that took place on May 23, 1997. On May 28, 1997, five days later, the defendant committed a robbery at Bank of the West. The victim's initials are SJL. Less than a month later, the defendant committed a robbery at Home Savings on June 20, 1997. There were four victims that were named.

Five days later, on June 25, 1997, the defendant committed another robbery. This time at Surety Bank. Two victims named. About two weeks later, the defendant committed another robbery. This time on July 7, 1997, at Bank of the West. There were two victims named. According to the probation report, restitution being demanded by Bank of the West is approximately $28,000.

The Court would note that these robberies were committed after the defendant had just gotten out of jail, less than a year earlier out of prison, rather, for committing another series of robberies.

In these robberies, the defendant and codefendant appeared to be armed. In a number of circumstances, they jumped behind the counter where the victims were. In one of the robberies, I believe it was the Round Table Pizza robbery or one of the others, the defendant had ordered the victim there to get down on the floor on his knees while the defendant brandished a gun. These were extraordinarily serious robberies. They terrorized these victims.

The Court notes that the defendant attacked vulnerable victims. The Court does note that no physical injury was inflicted. However, emotional injury was inflicted on these victims. The defendant was an active participant. The crimes were not committed because of an unusual circumstance, such as great provocation, which is unlikely to recur. And the Court is referencing the California Rules of Court.

The manner in which the crimes was [sic] committed demonstrated criminal sophistication or professionalism on the part of the defendant.

The Court has examined the defendant's prior history as required by law and notes his first robbery was committed May 8, 1991. At the time, the defendant was 17 years old. The victim was a Gretchen Cruz. And he had what appeared to be a gun. The probation department did struggle with the appropriate disposition in that case and was debating whether to send the defendant to the California Youth Authority or to Rite of Passage, and ultimately felt that more services would be available to him at Rite of Passage than at the Youth Authority. And by that time, he had been committing petty thefts that the Court has previously referenced.

Ultimately, the juvenile court sent him to Rite of Passage and he remained there. He finished at Rite of Passage, was released, and two weeks later, committed a string of robberies.

On January 23, 1993, the defendant committed a robbery at Subway sandwich shop. Two victims, Chavez and Ramirez, were there. He was charged with using a firearm in the commission of this robbery. Five days earlier, on January 24, the defendant committed a robbery at a 7-11 store. One victim present there. On February 6, 1993, which was about seven days after the January 29 robbery, the defendant went on a robbery rampage essentially.

On February 6, 1993, he went to the 7-11 store and committed a robbery. The same day, February 6, 1993, according to the allegations of the Complaint and Information, the defendant went to the Subway sandwich store and robbed two people. On February 6, 1993, same day, he went to Little Cesars [sic] Pizza, committed a robbery and was in possession of what appeared to be a firearm. On February 6, 1993, the same day, he went to Payless Shoe Store and committed a robbery with what appeared to be a handgun. The victim R. Delarose.

Again, after having been released from the Youth Authority, the defendant committed those robberies. And for that, he was sent to state prison. By my calculation, he was 19 when all these robberies were committed. One would have thought that after going to Rite of Passage, which is probably the most severe program that the juvenile authorities have short of the Youth Authority, and after going to state prison for the robberies the Court just recounted, that the defendant would hesitate before committing another crime. One would think that the defendant would not want to commit a shoplift or any other type of crime that could land him back in custody.

It did appear for a while that after the string of robberies and prison sentence that Mr. Nesbitt was getting his life on track. My understanding of the probation report is that he was allowed to stay with his family or had familial support, was going to school, was working and doing all the things that one would hope would result from this incarceration, but rehabilitation was not to be.

22

Less than one year later, the defendant then embarked upon all the robberies that has brought him before this Court.  It does appear that whenever he's not in custody, he's going to rob people, and that custody does not do anything to change his basic character.  The Court is required to look at his character in determining whether his situation is, one, deemed outside the scheme set forth by three strikes.

With respect to his background, again, he comes from an intact family.  His father was there for him.  His mother was there.  He had one brother.  And he was basically a kid who was a military brat and had the benefit and detriment of travelling [sic] at different places and living in different countries, different socio-economic backgrounds but an intact family.

His father was described as a terror to this Court by the mother.  And that information was given to Dr. White.  But as this Court has pointed out, that is in direct contrast with all the information given regarding this family back when the juvenile system was desperately trying to salvage this family and everybody was spilling out what was going on inside that household.

So with that background and that kind of family, the defendant began stealing at a young age.  Stole from his grandparents, and counseling did nothing to stop this.  This is criminology background.  It's not clear the source of the defendant's pathology.  That has not been identified.  And the Court also notes with some trepidation the fact that this defendant seemed to have led other people into crime, particularly his younger brother, Hayden, and his codefendant Mr. Powell.

The Court notes that the defendant was older than Mr. Powell and had a more sophisticated record.  In addition to committing crimes and destroying his own life, he has dragged other people, younger people, to whom he should have been a role model into the criminal justice system.  It seems to the Court at this point in his life, the defendant may have changed.  It sounds as though he has gotten older and more mature and is now trying to help people inside the justice system.

The Court notes that the defendant is an intelligent man.  Apparently, he's now well read and is doing things inside the system to try to help other people who are going through the system.

The Court in evaluating all of the factors that have been described, must ask whether or not the motion that has been made is in the furtherance of justice.  This Court concludes that such an exercise of discretion to strike priors would not be in furtherance of justice.

The Court has described the defendant's criminal history, his

1   background.  Again, it's not clear what in his character has drawn
    the defendant to repeatedly commit robberies.  The Court has
2   stated that when he's not in custody, he robs people.  This seems to
    be the type of person that the three strikes law was meant for.  He's
3   demonstrated by his conduct that he poses a great danger to public
    safety.
4
    Therefore, this Court will conclude that the balance between
5   punishment and mercy in this case must weigh in favor of public
    safety.  And this Court will conclude that it would be an abuse of
6   discretion to grant the motion; and, therefore, the Court will deny
    the motion to strike the priors.
7

8   RT, Aug. 30, 2005, pp. 62-69.

9           Mr. Fracchia, who had been appointed for purposes of presenting the Romero

10  motion, asked to be relieved from his limited appointed to the case, which request was granted.

11  Id., at 69–70.

12          Thus, this court's review of the record confirms the accuracy of the state appellate

13  court's summary of the final day of the Romero hearing on August 30, 2005.

14          At the outset of the hearing on August 30, the court verified that
    counsel had in fact received the 1991 documents, and inquired
15  whether the defense or prosecution wished to say anything before
    the court made its ruling on the Romero motion.  Defense counsel
16  responded: "I discussed it with [defendant]. We're prepared to go
    forward today." Cocounsel Fracchia, who had taken the lead in
17  arguing the Romero motion, advised the court that he had gone
    through the material with defendant and was prepared to comment
18  on it.  He told the court that defendant's denial of a history of abuse
    in 1991 was in fact typical or common in families where such
19  abuse had taken place, and was therefore not surprising or
    inconsistent with the information that had been presented in
20  support of the Romero motion. After highlighting portions of the
    material that he argued were favorable to defendant's position,
21  Fracchia concluded his argument by saying, "Submitted."

22          After the prosecution advised that it had not received the faxed
    documents, the court summarized their contents for the record, at
23  one point characterizing the information in them concerning
    defendant's relationship with his father as being "in stark contrast
24  to the evidence that was presented during the Romero hearing."
    The court went on to explain at length the legal framework and
25  factual basis for its decision to deny defendant's motion. It
    discussed the particulars of the 1997 crimes, the fear in which he
26  put his victims, and the fact that the robberies were committed less

24

than a year after defendant had gotten out of prison for the 1993 robberies. The court went on to describe the circumstances of the 1991 and 1993 robberies, and the fact that the 1993 robberies occurred two weeks after defendant was released from the Rites of Passage program. The court stated: "It does appear that whenever he's not in custody, he's going to rob people, and that custody does not do anything to change his basic character." The court described defendant's family as an "intact family" in which both parents were "there for him." In that connection, the court contrasted Dr. White's information with the information family members provided "when the juvenile system was desperately trying to salvage this family and everybody was spilling out what was going on inside that household." The court noted that defendant began stealing at an early age and that the "source of [his] pathology" has not been identified.

Although acknowledging that defendant may have gotten older and more mature, and that he seemed to be trying to help people inside the justice system and educate himself, the court concluded that granting the motion would nonetheless not be in furtherance of justice. As the court summed up its reasoning, "The Court has stated that when he's not in custody, he robs people. This seems to be the type of person that the three strikes law was meant for. He's demonstrated by his conduct that he poses a great danger to public safety. [¶] Therefore this Court will conclude that the balance between punishment and mercy in this case must weigh in favor of public safety. And this Court will conclude that it would be an abuse of discretion to grant the motion...."

People v. Nesbitt, A112968, 2007 WL 2110983 *6-*7.

Petitioner's motion to continue the sentencing was heard on December 9, 2005, the date set for judgment and sentencing.   Answer, p. 18, citing Ex. B, RT, Dec. 9, 2005. Petitioner's defense counsel states that the basis for bringing the motion is to have an opportunity litigate the question of judicial notice.  RT, Dec. 9, 2005, pp. 5, 7.  Defense counsel Mr. . Spieckerman stated in part:

There is no doubt that the Court could take judicial notice of certain parts of the probation report.  I read the first two or three pages that contain the non-argumentative or things that everybody agreed on: Date of birth and all those historical kinds of things. And that is where I was coming from.  I had not read it as Mr. Fracchia had.  So there was no opportunity for - - I think there is another case that indicates the Court, when they are going to go into a probation report, would say "I am taking judicial notice of this, this, and this."  And then we have an opportunity to say, "Oh

1                  well, that was a contested issue of fact, and the Court should not
take judicial notice of this case."  I didn't realize you were going
2                  into those other issues.

3    RT, Dec. 9, 2005, p. 7.

4              The court denied the motion for a continuance, noting that after the report had

5    been

6    faxed to counsel "at a very late hour:"

7                  there was a question raised as to whether or not the Romero motion
should go forward once counsel had received the material.  And
8                  both counsel and Mr. Nesbitt were given the opportunity to protest
at that time regarding receiving the material late, not wanting to go
9                  forward on that.  And Mr. Nesbitt indicated he wanted to go
forward with the case in its current posture.
10

11                I do note that after the Romero hearing the Court did not hear any
motion to set aside the ruling because of the late receipt of the
report from the juvenile court.  So I think at this point in time given
12                the number of months that have passed since the Romero motion
that it simply is not timely.
13

14    RT, Dec. 9, 2005, p. 10.

15            Nevertheless, the court was willing to address that same day "the substantive issue

16    regarding the propriety of the Court taking judicial notice."  Id.

17            In arguing on the merits, defense counsel stated, in part:

18                [T]he whole point of what we have been trying to say is Mr.
Nesbitt's own statements at the time he was 16 versus the time he
19                is 29 or 28, that there is a psychological reason for the way that he
explained himself when he was 16.  And then without additional
20                experts explaining that to the Court we are left with accepting the
comments of a child in a probation report as true when
21                psychologically he may have felt they were true but in reality it was
- - as we know, your mind can cause us to do a lot of things that are
22                not really rational and have other reasons for saying things, like
protecting your father or whatever goes into that thought process.
23

24                That is why I contacted Ms. White.  Because that is not my area.
And I think taking those issues, those statements at face-value and
25                then saying then that just proves everything that we already talked
about yesterday or the - - whenever that is - - the real problem, we
26                would like to have been able to have the time to go back and have
the doctor look at it.  And she says had she had that report she

could have used it and helped everyone get some better insight into
Mr. Nesbitt's thought process, especially at that time.

Id., at 16-17.

At the conclusion of argument by defense counsel and the prosecutor, the court
ruled as follows:

> The Court at this time will find that the Court did not err by taking
> into consideration the contents of the juvenile probation report.
> The Court will find again that essentially there was a waiver of the
> Court's considering of the report and of any impropriety of the
> Court's considering that, and that after the Court had faxed the
> material over to all counsel prior to the hearing there was no
> objection made to the Court considering that.  And the Court did
> give the defense an opportunity to postpone the matter if there was
> some prejudice felt by receiving it at the time that it was received
> and concern about the propriety of the Court considering it.  The
> defendant had wanted to go forward with the Romero hearing at
> that time, so the Court did proceed.
>
> The Court notes that Mr. Nesbitt at the time was represented by not
> just one but two lawyers who were fully representing his interests.
> And at that time there was no concern felt regarding the Court
> taking into consideration this information.  The Court does not
> fault counsel for that position because I do note that a substantial
> portion of Dr. White's presentation was based on hearsay
> information that she received from a variety of written sources and
> oral presentation from other people.  So much of that information
> was presented to the Court during the course of the Romero
> hearing was based on hearsay.
>
> This particular hearsay happened to be a juvenile court record of
> which Dr. White was unaware.  But this information fell into the
> same tone as the bulk of the information that the Court received.
> And I do not feel that the defendant was prejudiced by the Court
> considering that information.  And the Court also notes that Dr.
> White was aware of the fact that the defendant had sustained a
> juvenile conviction.  And I just find it interesting that she did not
> request access to his juvenile files.
>
> There was much talk of what his life was like when he was a young
> person and the fact that he had been part of the juvenile justice
> system.  So it would have seemed normal to me for her to have
> access or at least asked if there had been psychological evaluations
> done when he went through the juvenile process and probation
> reports.  And apparently that request was not made.  Mr.
> Spieckerman asked where did this report come from at the time it
> came in.  And that report was sitting in the juvenile file.  I simply

pulled the file and found it and read it. So it was there from the time that he was adjudicated a ward of the Court many years ago until this very day. So that has always been there.

But, again, most of the information that was presented to the Court through Dr. White was hearsay received from the defendant's mother, the defendant and other people that she interviewed in preparing her report for the Court. *In addition to that report, the Court had substantial other evidence that was presented by way of the defendant's prior record and the facts of the robberies involved that supported a denial of the Romero motion.* So at this time this Court will find that there was no error in the Court reviewing that juvenile record and giving it to counsel at the time that it was given to counsel and that the Court properly considered that in making a ruling on the Romero motion.

RT, Dec. 9, 2005, pp. 18-21 [emphasis added.]

Once again, the state appellate court's summary of the sentencing hearing

correctly reflects the record as confirmed by the undersigned:

After a few postponements, the sentencing hearing was set for December 9, 2005. On December 7, defendant filed a motion to continue the hearing so that he could raise objections to the trial court's taking of judicial notice of the 1991 juvenile court documents. Defense counsel explained that the motion was filed late because counsel erroneously believed that sentencing had been scheduled for December 16. [11] The prosecution opposed any continuance, and submitted written arguments supporting the propriety of the trial court's decision to take judicial notice of the juvenile court documents.

At the December 9 hearing, the trial court denied the defense motion for a continuance, but permitted defendant to offer arguments on the issue of whether it had erred in taking judicial notice of the 1991 probation report. Following argument, the court rejected defendant's position on the following grounds: (1) defendant had waived any objection to its taking judicial notice of the report; (2) the report was based on the same type of family member interviews that Dr. White had relied on in developing her psychosocial history; (3) the report was not a secret and it would have been available to Dr. White and the defense had they thought to request it;4 and (4) the court had substantial other evidence before it regarding defendant's record and the facts of the robberies that supported a denial of the *Romero* motion. The trial court sentenced defendant to a total indeterminate term of 125 years to

---

[11] This court notes that the motion to continue is located in resp. Ex. A, Clerk's Transcript, vol. II, pp. 747-756.

life, plus a consecutive, determinate term of eight years.

People v. Nesbitt, 2007 WL 2110983 * 7.

In finding that the petitioner had waived his claim that the trial court "prejudicially erred in taking judicial notice of, and in relying on, hearsay statements contained in the 1991 probation department report." the state court of appeals noted first that petitioner had waived the claim by having failed "to raise it at the time the trial court decided his Romero motion." People v. Nesbitt, 2007 WL 2110983 * 7.

> The final *Romero* hearing began at 3:00 p.m. on August 30, 2005. Defendant was represented by two attorneys at the hearing, Carl Spieckerman and Robert Fracchia. Copies of the documents to be judicially noticed had been faxed separately to both defense attorneys the previous afternoon. Both attorneys stated on the record that they had gone through the material with the defendant before the hearing. Attorney Spieckerman specifically advised the court that defendant was prepared to go forward with the hearing, and attorney Fracchia proceeded to make arguments addressed to the contents of the probation report. Defense counsel submitted the *Romero* issue for decision without raising any objection to the trial court taking judicial notice of it and without requesting a continuance to further consider or present argument on the issue of judicial notice. Counsel also made no objection after the trial court summarized the contents of the probation report or announced its decision to deny the *Romero* motion.

> Defendant first raised objection to the court taking judicial notice of the probation report on the eve of his sentencing hearing, more than three months after the Romero issue had been decided against him. This was too late to preserve the issue for appellate review. (Evid.Code, § 353; *People v. Welch* (1972) 8 Cal.3d 106, 114-115; *Younan v. Caruso* (1996) 51 Cal.App.4th 401, 406, fn. 3.)  That the trial court addressed the merits of the judicial notice issue at the December 9 hearing out of an abundance of caution does not relieve defendant of his waiver.  As the prosecution argued and the court specifically found at the time, defendant had already waived objection by the time of that hearing.

People v. Nesbitt, 2007 WL 2110983 * 8.

### *Procedural Default*

> "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support

the judgment.'"" *Kindler*, 558 U.S., at_____, 130 S.Ct., at 615 (quoting *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)).  The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  See *Sykes*, 433 U.S., at 81-82, 90, 97 S.Ct. 2497.

Ordinarily, a state prisoner seeking federal habeas relief must first "exhaus[t] the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A), thereby affording those courts "the first opportunity to address and correct alleged violations of [the] prisoner's federal rights," *Coleman*, 501 U.S., at 731, 111 S.Ct. 2546.  The adequate and independent state ground doctrine furthers that objective, for without it, "habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court." *Id*., at 732, 111 S.Ct. 2546.  Accordingly, absent showings of "cause" and "prejudice," see *Sykes*, 433 U.S., at 84-85, 97 S.Ct. 2497, federal habeas relief will be unavailable when (1) "a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement," and (2) "the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S., at 729-730, 111 S.Ct. 2546.

To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." *Kinder*, 558 U.S., at _____, 130 S.Ct., at 618 (internal quotation marks *1128 omitted). [Footnote] 4 "[A] discretionary state procedural rule," we held in *Kinder*, "can serve as an adequate ground to bar federal habeas review." *Ibid*. A "rule can be 'firmly established' and 'regularly followed,'" *Kinder* observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Ibid*.

> [Footnote] 4 We have also recognized a "limited category" of "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question. *Lee v. Lemna*, 534 U.S. 362, 376, 122 S.Ct. 877, 151 LED.2d 820 (2002).  In *Lee*, for example, the defendant unsuccessfully moved for a continuance when, for reasons unknown to him, his alibi witnesses left the courthouse the day they were scheduled to testify.  This Court held inadequate to bar federal review a state court's persnickety application of a rule detailing formal requirements for continuance motions.  The defendant had substantially complied with the rule's key requirement and flawless compliance would have been unavailing given the trial court's reason for denying the motion.  See *id*., at 381–382, 122 S.Ct.

1     877.

2  <u>Walker v. Martin</u>, ___ U.S. ___,131 S. Ct. 1120, 1127-28, & n. 4 (in part) (2011).

3          This court has previously stated with regard to this issue:

4          The finding that petitioner had forfeited his right to challenge the
           trial court's judicial notice of the 1991 probation report by failing
5          to object timely would appear to present a separate hurdle for
           petitioner in the form of a procedural bar inasmuch as "[I]n is well
6          established that federal courts will not review questions of federal
           law presented in a habeas petition when the state court's decision
7          rests upon a state-law ground that 'is independent of the federal
           question and adequate to support the judgment.'" <u>Cone v. Bell</u>, ___
8          U.S.___, 129 S. Ct. 1769, 1780 (2009), quoting <u>Coleman v.
           Thompson</u>, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); <u>Lee v.
9          Lemna</u>, 534 U.S. 362, 375, 122 S.Ct. 877, 151 LED.2d 820
           (2002[).]

10

11  <u>Order</u>, filed on Jan. 28., 2011, p. 17, n. 5.

12          In denying petitioner's claim on the ground that he failed to raise a

13  contemporaneous objection to the court's taking judicial notice of the juvenile report, the state

14  appellate court "relied on a state procedural doctrine that was not interwoven with or dependent

15  on federal law,  <u>Ake</u>, 470 U.S. at 75, 105 S.Ct. at 1092; <u>Long</u>, 463 U.S. at 1040–41, 103 S.Ct. at

16  3476; <u>lacrosse</u>, 244 F.3d at 704, and which was a 'firmly established and regularly followed state

17  practice... .'" <u>Flores v. Hackman</u>, 533 F. Supp.2d 1068, 1084 (C.D. Cal. 2008), citing "<u>People v.

18  Alvarez</u>, 14 Cal.4th 155, 186, 58 Cal. Rptr. 2d 385, 403 [](1996)('It is, of course, the general rule

19  ... that questions relating to the admissibility of evidence will not be reviewed on appeal in the

20  absence of a specific and timely objection in the trial court on the ground sought to be urged on

21  appeal.' ([Citations and internal quotation marks omitted)), cert. denied, 522 U.S. 829, 118 S.Ct.

22  94, 139 LED.2d 50 (1997); <u>People v. Pinholster</u>, 1 Cal.4th 865, 935, 4 Cal.Rptr.2d 765, 798, 824

23  P.2d 571 (1992) (same), cert. denied, 506 U.S. 921, 113 S.Ct. 338, 121 LED.2d 255 (1992).

24  When an independent and adequate state procedural bar has been raised by respondent, "the

25  burden shifts to petitioner 'to place that defense in issue.' <u>King</u>, 464 F.3d 966-67; <u>Bennett</u>, 322

26  F.3d at 586."

1    Petitioner, in his reply, points to, inter alia, several cases wherein the state

2    appellate court reached the merits of a constitutional claim although there was not a timely

3    objection, citing <u>People v. Cabrellis</u>, 251 Cal. App.2d 681, 685[, 59 Cal. Rptr. 795] (1967)

4    (prosecutorial misconduct so flagrant appellate court considered the issue of injection of

5    inadmissible evidence despite no objection at trial); <u>People v. Chambers</u>, 231 Cal. App.2d 23,

6    28[, 41 Cal. Rptr. 551] (1964) (defendant's failure to object to a number of trial errors was

7    overlooked because the "unfairness" was "so gross" to have deprived petitioner of due process);

8    <u>People v. Underwood</u>, 61 Cal. 2d 113, 125[-126][, 37 Cal. Rptr. 313] (1964) (lack of timely

9    objection to defendant's prior statement being introduce did not prevent review of errors on

10   appeal); <u>People v. Simon</u>, 80 Cal. App. 675, 678-79 (1927) (despite failure to object,

11   prosecutorial misconduct claim reviewed).  Reply, p. 4.  The court notes that each of these

12   decisions occurred in the very to somewhat distant past and in each case, pains were taken to

13   justify an exception to the usual rule.

14   Petitioner also relies on cases where state courts have addressed the merits of a

15   constitutional claim that comes within the procedural bar in order to avoid a later habeas

16   proceeding which implicates the same issue, citing <u>People v. Blanco</u>, 10 Cal. App. 4th 1167,

17   1172-73[13 Cal. Rptr.2d 176](1992), which in turn cites several cases wherein the state Supreme

18   and other appellate courts "sometimes addressed ...constitutional questions in the absence of

19   proper objection below." Reply, p. 4.   Petitioner notes that in <u>People v. Norwood</u>, 26 Cal.

20   App.3d 148, 153[, 103 Cal. Rptr. 7] (1972), the court addressed an issue it stated was not

21   normally reviewable on direct appeal when the record showed it "to be vulnerable to habeas

22   corpus proceedings based upon constitutional grounds... ." <u>Id.</u>, at 5.  And in <u>People v. Allen</u>, 41

23   Cal. App.3d 196, [201-]202[, 115 Cal. Rptr. 839 (1974), it was determined that the [Fifth

24   Amendment] constitutional question could "be raised for the first time on appeal").   <u>Id.</u>

25   Petitioner also points to two state Supreme Court cases, wherein the court considered a claim's

26   merits "despite a failure to object, for no apparent reason." <u>Id.</u>, citing <u>People v. Silva</u>, 45 Cal.3d

32

1   604, 638[, 247 Cal. Rptr. 573] (1988) (addressing two instances of prosecutorial misconduct,

2   despite failure to object at trial); People v. Malone, 47 Cal.3d 1, 38[, 252 Cal. Rptr. 525](1988)

3   ('[a]ssuming arguendo defendant has not waive the asserted misconduct by failure to object or

4   request an admonition, we conclude the questions were not prejudicial error.'")

5          However, the Ninth Circuit has long held that the state's contemporaneous

6   objection rule is consistently applied where no objection is made at the appropriate time.

7   Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) ("[w]e held more than twenty years ago

8   that the rule is consistently applied when a party has failed to make *any* objection to the

9   admission of evidence"[emphasis in original]), citing Garrison v. McCarthy, 653 F.2d 374, 377

10  (9th Cir. 1981); see also, Vansickel v. White, 166 F.3d 953, 958 (9th Cir. 1999) (California's

11  contemporaneous objection rule constitutes an adequate and independent state ground for a claim

12  to be procedurally barred).   And, the fact that a procedural bar admits of exceptions to be applied

13  in the discretion of the court does not mean that the bar is not regularly applied.  Walker, 131

14  S.Ct. at 1128-1130.

15         Petitioner also notes that respondent has conceded and indeed the state

16  appellate court in this instance did consider the merits of petitioner's claim that he was denied a

17  fair sentencing hearing, subsequent to finding the claim waived.  Id.  However, as a sister court

18  has noted:

19         The fact that the California Court of Appeal alternately decided
           this claim on the merits does not prevent this claim from being
20         procedurally barred in federal court.  See Harris v. Reed, 489 U.S.
           255, 264 n. 10, 109 S.Ct. 1038, 1044 n. 10, 103 LED.2d 308
21         (1989) ("[A] state court need not fear reaching the merits of a
           federal claim in an alternate holding.  By its very definition, the
22         adequate and independent state ground doctrine requires the federal
           court to honor a state holding that is a sufficient basis for the state
23         court's judgment, even when the state court also relies on federal
           law."); Bargas v. Burns, 179 F.3d 1207, 1214 (9th Cir.1999) ("The
24         state court concluded that petitioner procedurally defaulted—a
           state ground—and alternatively rejected petitioner's claim on the
25         merits—a constitutional ground. The alternative federal law
           holding of the court in no way disturbs the independent state law
26         ground for dismissal."), cert. denied, 529 U.S. 1073, 120 S.Ct.

1686, 146 LED.2d 493 (2000).

Flores v. Hackman, 533 F. Supp.2d at 1084, n. 7.

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991).  This court finds that as petitioner is unable to make such a showing, the claim is procedurally defaulted and as such this court is barred from reviewing it.

Nevertheless, in the alternative, and as did the state appellate court, this court will reach petitioner's claim on its merits, such as they are.  The "merits" corresponds to issues 2 and 3 set forth above:

> 2) trial court erred by taking judicial notice of hearsay statements contained in the juvenile probation report and relying on them as true in denying petitioner's Romero motion;
>
>  3) trial court's improper exercise of judicial notice of statements where statements accepted as true prejudiced petitioner and violated his constitutional rights by eviscerating defense's ability to make a presentation in support of the Romero motion and to contest the court's findings.  AP, pp. 19, 21, 25.

In reviewing issue 2, however, it must be noted that clearly established Supreme Court authority has long found reliable hearsay admissible at sentencing hearings.  Williams v. New York, 337 U.S. 241, 246, 69 S. Ct. 1079 (1949) (sentencing judge has broad discretion "in the sources and types of evidence used ... in determining the kind and extent of punishment to be imposed within limits fixed by law"[12]).  Although, as noted in footnote 1 above, the Supreme

---

[12] "To deprive sentencing judges of this kind of information [probation reports] would undermine modern penological procedural policies that have been cautiously adopted throughout

1  Court in <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354, determined that the Sixth

2  Amendment confrontation clause was violated by the admission of any out-of-court statement by

3  an unavailable witness not previously subjected to cross-examination, the Ninth Circuit has made

4  clear that post-<u>Crawford</u>, the use of hearsay testimony during sentencing remains appropriate.

5  <u>United States v. Littlesun</u>, 444 F.3d 1196, 1198-99 (9th Cir. 2006) (noting the Supreme Court's

6  holding in <u>Williams</u>, <u>supra</u>, "that admission of hearsay evidence at sentencing did not violate the

7  due process clause," in resolving in the affirmative the question of whether or not, post-<u>Crawford</u>

8  <u>v. Washington</u>, the use of hearsay testimony during sentencing is appropriate).

9           Individualization of sentences made it especially necessary to
         review a broad range of sentencing information that was not

10           appropriately submitted to juries considering guilt.

11           Congress has since provided by statute that the hearsay rule and
         other evidentiary limitations do not apply to sentencing:

12

13                  No limitation shall be placed on the information
                concerning the background, character, and conduct
                of a person convicted of an offense which a court of

14                  the United States may receive and consider for the
                purpose of imposing an appropriate sentence. []

15

16           We require only that the testimony "be accompanied by some
         minimal indicia of reliability." []

17  <u>Littlesun</u>, 444 F.3d at 1199.  Therefore, on the face of it, the state court appellate opinion is not

18  an objectively unreasonable application of clearly established Supreme Court authority simply

19  because hearsay, even assuming it could be characterized as such, was admitted at sentencing.

20          To the extent that petitioner contends in issue 3 that the taking of judicial notice of

21  evidence *per se* was error, or that the trial court "abused its discretion" in not properly weighing

22

23  the nation after careful consideration and experimentation. We must recognize that most of the
information now relied upon by judges to guide them in the intelligent imposition of sentences
would be unavailable if information were restricted to that given in open court by witnesses

24  subject to cross-examination.  And the modern probation report draws on information concerning
every aspect of a defendant's life. []  The type and extent of this information make totally

25  impractical if not impossible open court testimony with cross-examination. Such a procedure
could endlessly delay criminal administration in a retrial of collateral issues."  <u>Williams</u>, <u>supra</u>, at

26  249-50, 69 S. Ct. at 1084-85.

the allegations of child abuse in determining whether to strike a prior, the undersigned does not recognize a federal issue with respect to these contentions.  Errors in application of state law are not cognizable in federal habeas corpus.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991).

But even upon analyzing the state law contentions, assuming the incorrect proposition that every state law asserted error has due process implications, the state court of appeal failed to see that the taking of judicial notice of evidence that countered more recent protestations of child abuse was the *ratio decidendi* of refusing to strike a previous conviction (denial of the Romero motion).  In affirming the judgment, the state court of appeals opinion addressed petitioner's  claim before it on the merits as follows:

> We find no cognizable error and no prejudice. . . . [D]efendant was not prejudiced by any assumed trial court error in considering the 1991 document. The trial court did not in fact rely on the 1991 report, and did not abuse its discretion in deciding to deny defendant's motion. To the contrary, it would have been an abuse of discretion to grant the motion regardless of the truth or falsity of the matters asserted in the document.
>
> - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
>
> Even assuming for the sake of analysis that defendant had not forfeited his right to appellate review of the judicial notice issue, and that the trial court erred in considering it, defendant still fails to establish that he was prejudiced. Whether defendant did or did not suffer abuse as a child was simply not a material factor in the court's decision to deny his Romero motion, nor should it have been.
>
> The purpose of the Three Strikes law is to provide longer sentences to, and greater protection to the public from, habitual or " 'revolving door' " criminals. (*See People v. Strong* (2001) 87 Cal.App.4th 328, 331-332.)  Defendant had the burden of convincing the trial court that the Three Strikes statute should not be enforced against him because the nature and circumstances of his present offenses and prior convictions, and the particulars of his background, character, and prospects, took him outside the spirit of that law. *(People v. McGlothin* (1998) 67 Cal.App.4th 468, 473-474.)  As the trial court fully recognized, the striking of a prior strike conviction is not to be done lightly. It is an extraordinary exercise of discretion comparable to the setting aside of a judgment of conviction after trial. (*Id.* at p. 474.)

*9 The trial court provided a detailed explication of its reasons for denying defendant's motion, including a recitation of the facts of defendant's crimes and of his criminal history. Among other things, the court observed that the 1997 robberies were "extraordinarily serious" crimes that inflicted emotional injury on and "terrorized" the victims, and were carried out in a manner that showed criminal sophistication. The facts of defendant's 1991 and 1993 robberies showed equal callousness toward the victims. The court observed, moreover, that neither defendant's experience in Rites of Passage nor his incarceration for the 1993 robberies caused him to hesitate before going on to commit further serious crimes. The 1993 crimes occurred two weeks after defendant's release from juvenile supervision for the 1991 offense. Following his incarceration for the 1993 crimes, defendant had full family support and was going to school and working, yet, as the court recounted, within a year after his release from CYA defendant threw this opportunity away as well, and committed the 1997 robberies. As the trial court aptly summed it up, "custody does not do anything to change his basic character."

Regarding defendant's background, the court noted that he came from an "intact family" and experienced both the benefit and detriment of traveling to different places and living in different countries. Although the court mentioned that the mother's in-court description of the father as a "terror" was in direct contrast with what was stated in the 1991 probation report, it did not purport to decide which version was closer to the truth or to rely on one version over another in arriving at its conclusions. Instead, it is apparent from reading its statement of reasons that the court's decision was driven by the serious nature of defendant's offenses, by his confirmed pattern of recidivism, and by the court's well-founded unwillingness to expose the public to the danger that defendant's claim of inner transformation was simply another stratagem for manipulating the system. [Footnote] 5[13]

The trial court stated that it would have been an abuse of discretion to grant defendant's motion. In our view, that statement would still have been true even if the 1991 probation report had never surfaced. Even if accepted at face value, defendant's claim of past child abuse neither excuses his past pattern of criminality nor outweighs the danger to which the public would be exposed if he is released. [Footnote] 6[14]

---

[13] [Footnote 5] "On cross-examination, Dr. White admitted that she agreed with doctors who had examined defendant in 2002 that he was feigning mental illness at that time in order to have himself declared incompetent to stand trial. According to his 1993 presentence report, defendant had expressed remorse for the emotional trauma he caused to his 1993 victims."

[14] [Footnote 6] "Although we need not address the merits of defendant's evidentiary error claim, we do note that his hearsay objection to the consideration of his statements to the

People v. Nesbitt, 2007 WL 2110983 *7-*9.

In ruling against petitioner's motion for discovery, the undersigned set forth the following:

> Even though finding that petitioner had waived his right to object to the trial court's judicial notice of the 1991 probation report,[] ... , the state court of appeals made clear that even if petitioner had not forfeited his right to appeal the issue and even if it had been trial court error to consider it, petitioner did not establish that he was thereby prejudiced.  The state appellate court made clear that any history of child abuse petitioner may have suffered was not only not material to the denial of the Romero motion by the trial court, it *should not have been*, given his overall record.  In other words, petitioner could not rely on any history of child abuse to have rendered a different ruling as any such history could not have reached the requisite level to show he was prejudiced thereby in the trial court's ruling.  In essence, the state appellate court found it would have been an abuse of discretion by the trial court to have granted the Romero motion because any such abuse would not have constituted carte blanche for petitioner to have engaged in the numerous prior robberies.  As noted, to show any entitlement to the discovery at issue, petitioner's claim must implicate the sentencing decision as having been significantly based on information that was materially untrue.  Tucker, supra, at 447, 92 S. Ct. at 592.  Because, under Estelle, supra, this court cannot debate the state appellate court's decision concluding that it would and should have made no difference to the ruling on the Romero report whether or not the 1991 probation report contained accurate information, the undersigned finds good cause is not shown for seeking discovery to show inaccuracy of the information regarding petitioner's child abuse history contained therein. [Footnote] 6 [[15]]  In other words,

probation officer is not well taken. Defendant's own admissions are not hearsay, and since there is no dispute over the accuracy of the probation officer's report of those statements, the trial court was entitled to consider them for sentencing purposes. (Evid.Code, §§ 452, subd. (d), 1220; *People v. Lamb* (1999) 76 Cal.App.4th 664, 683.) In light of the latitude given to sentencing judges to consider "responsible unsworn or out-of-court statements [about the defendant's life]" so long as there is a "substantial basis" for believing them reliable (*People v. Lamb*, at p. 683), even reliance on the 1991 statements of defendant's parents might have been permissible. However, since there were ample other facts in the record that compelled the denial of defendant's motion, we need not determine whether the reliability standard was met."

[15] [Footnote 6] In any event, this court's review of the record of the proceedings at the Romero hearing before the sentencing judge indicates that Dr. White did testify about the incident that forms the basis for petitioner's request. In expanding an answer regarding physical abuse in the form of beatings petitioner had allegedly suffered as a child within his family, the following exchange occurred between one of petitioner's defense counsel, Mr. Fracchia, appointed to present the Romero motion, and petitioner's expert witness, Dr. White, who

1   giving appropriate AEDPA deference to the state Court of Appeal,
2   the sentence *was not based* on the disputed information, nor could
    it have been.

3   <u>Order</u>, filed on Jan. 28, 2011, pp. 17-18.[16]

4           Accordingly, IT IS RECOMMENDED that the petition be denied.

5           These findings and recommendations are submitted to the United States District

6   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

7   days after being served with these findings and recommendations, any party may file written

8   objections with the court and serve a copy on all parties.  Such a document should be captioned

9   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10  shall be served and filed within fourteen days after service of the objections.  The parties are

11  advised that failure to file objections within the specified time may waive the right to appeal the

12

---

13  conducted an investigation and prepared a psychosocial evaluation concerning petitioner's
14  background (AP (dkt. # 4), p. 42):

15          "Q.  And was there any indication that this was something that had
            been brought to the attention of persons beyond his immediate
            family?
16          A.  Yes.  When he was still, I think, in elementary school, he was
            taking swimming lessons, and the swimming coach had contacted
17          the police about the marks on the skin.  And the police came and
            spoke to the mother during - - um, during his time at the swimming
18          pool and indicated it was not appropriate behavior, not appropriate
            to discipline a child in this way."
19
20  AP (dkt. # 4, pp. 79: 7-17)[<u>see also</u>, RT, July 29, 2005, p. 49.]

21          Whether noted or not therefore in the trial judge's remarks at the point of
    sentencing, there appears to have been some reference to the incident involving the report to
22  police arising from petitioner's being observed at a swimming pool as a youngster with some
    skin marks.  The incident [was also] included in Dr. White's report which was submitted to the
23  court. [CT, vol. II, p. 657].

24      [16] This excerpt also appears on page 3 of the <u>Findings and Recommendations</u>, filed on
    April 6, 2011, recommending denial of petitioner's motion to certify for appeal the district
25  judge's order of March 16, 2011, which denied reconsideration of the January 28, 2011, order of
    the undersigned, denying petitioner's motion for leave to conduct discovery and denying leave to
    amend to set forth an ineffective assistance of counsel claim.  The April 6, 2011, <u>Findings and
26  Recommendations</u> were adopted by <u>Order</u>, filed on May 10, 2011 (docket # 43).

1    District Courts order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

2         If petitioner files objections, he shall also address if a certificate of appealability

3    should issue and, if so, as to which issues.  A certificate of appealability may issue under 28

4    U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a

5    constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate of appealability must "indicate

6    which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

7    DATED: September 5, 2012

8

9                              /s/ Gregory G. Hollows
                         UNITED STATES MAGISTRATE JUDGE

10

11   GGH:009
     nesb2821.hab

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26